**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**KAREN MARIE ADAMS**, *formerly known as*
*Karen Marie Davis*,

                              Plaintiff,

                - v -                                                  Civ. No. 8:07-CV-452
                                                                                (LEK/RFT)

**THE VILLAGE OF KEESVILLE**, **MARK J. WHITNEY**,
*individually and as Mayor of the Village of Keesville*,
**WILLIAM SEAVER**, *individually and as employee of the*
*Village of Keesville*, **WILLIAM O' CONNOR**,
*individual and employee of Keesville*, **STANDARD**
**FEDERAL BANK**, **KATHRYN WILSON SMITH** and
**KENNETH L. SMITH**, **DONALD E. LOREMAN, SR.**,
and **CAROLYN LOREMAN**, and **BAYVIEW LOAN**
**SERVICING, LLC**,

                              Defendants.

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**MEMORANDUM-DECISION and ORDER**

On April 26, 2007, *pro se* Plaintiff Karen Marie Adams filed her civil rights Complaint,

pursuant to 42 U.S.C. § 1983, along with several common law causes of actions, against a host of

Defendants. Dkt. No. 1, Compl. Within a month, Adams amended her Complaint as a matter of

right. Dkt. No. 4, First Am. Compl. Pursuant to a direction within a Memorandum-Decision and

Order, dated May 24, 2007, Dkt. No. 5, Adams, once again, amended her Complaint, Dkt. No. 7,

Second Am. Compl. Upon receiving permission from this Court to add other parties, on January 16,

2008, Adams filed the Third Amended Complaint. Dkt. No. 57, Third Am. Compl.

On April 2, 2008, the Smith Defendants (the Smiths) filed their Answer, which noted that

their attorneys were Niles, Piller, & Bracy, PLLC (hereinafter "NPB"), Michael B. Fisher, Esq., of

counsel. Dkt. No. 98. Upon being served with the Smiths' Answer, Adams immediately asked this

Court for permission to file a motion to disqualify NPB as the Smiths' attorney.  Because of the possibility that sensitive and confidential communications may be disclosed, we granted permission for this motion to disqualify and the opposition to be filed under seal.  Text Order, dated Apr. 3, 2008.  On May 13, 2008, Adams filed a Sealed Motion to Disqualify NPB.  Dkt. No. 129.[1]  The Smiths filed an Opposition to the Motion.  Dkt. No. 133, Sealed Mot. in Opp., dated June 16, 2008.[2]  On July 8, 2008, Adams filed a Sealed Reply.  Dkt. No. 137.[3]  On July 22, 2008, Adams and Attorney Fisher appeared for a Hearing on the Motion, which was closed to the public.  At the conclusion of a lengthy hearing, the Court reserved its decision.

Based upon the moving papers, opposition thereto, and oral argument, the Motion to Disqualify is **denied**.

## I. BACKGROUND[4]

The allegations within the sizeable yet voluble Third Amended Complaint (52 pages of text and 78 pages of exhibits) are directed at ten Defendants and span approximately five years.  Dkt No. 57.  Even the Motion to Disqualify regales us with a dizzying array of facts, relationships, and contentions.  To cast this Motion and Third Amended Complaint as anything less than an unabridged

---

[1]  Adam's Motion to Disqualify is comprised of her Affidavit, dated May 12, 2008, with exhibits and a brief Memorandum of Law.  Dkt. No. 129.

[2]  The Smith's Opposition to the Motion to Disqualify is comprised of: An Affirmation of Michael B. Fisher, Esq., dated June 13, 2008, Kathryn W. and Kenneth Smith's joint Affidavit, dated June 6, 2008 (hereinafter Smiths' Affidavit), an Affirmation of Evan F. Bracy, Esq., dated June 10, 2008, exhibits, and a Memorandum of Law.  Dkt. No. 133.

[3]  With regard to Adam's Reply to Smiths' Opposition, she filed an Affidavit, dated July 8, 2008, with exhibits and a Memorandum of Law.  Dkt. No. 137.

[4]  In the discussions heretofore, it shall be understood that this Court, at this juncture of the litigation, is not making any findings of fact that may be binding upon the parties in the future.  Our recitation of the facts relies predominately upon the allegations in the Complaint and Adams' Motion papers.  Hence specific references and citations to the voluminous record, which comes from multiple sources, is not absolutely necessary for the purpose of deciding this Motion.

and labyrinthine dissertation of a half a decade of woe would be disingenuous.  The parties' familiarity with these facts are presumed but, with brevity in mind, we are compelled to outline the more salient facts and contentions as to this Motion.

The epicenter of this litigation is a piece of property identified as 1707-1709 Front Street, Keesville, New York.  All of the events and all of the parties noted in the Third Amended Complaint have had some connection with a series of transactions relevant to either the occupation, ownership, financing, or previous litigation revolving around this property.  And NPB may have a connection with most of these transactions and multiple parties enumerated in the Third Amended Complaint. Adams lost the property through foreclosure and she now alleges that the Defendants conspired with Village of Keesville officials to deprive her of this property without due process and in violation of the Equal Protection Clause.   Additionally, there are a sundry of other common law and statutory causes of actions pled against these Defendants.  *See generally* Dkt. No. 57, Third Am. Compl.

Adams charges NPB with a myriad of disciplinary and ethical lapses and breaches spanning at least five years.  *See infra* pp. 18-19, & note 10.  Because of these alleged disciplinary violations, particularly those pertaining to the issue of concurrent and successive representations of several parties to this litigation, Adams asserts that NPB should not be allowed to represent the Smiths.  Due to the course of the events set forth in the Third Amended Complaint, and probably going back further, Adams complains that NPB and Attorney Evan Bracy, a partner in the law firm, have represented the following people who may be intimately or more than tangentially involved in this litigation:

*Rocky Dixon*        is a creditor of Robert Davis, Adams' ex-husband.  Robert Davis was supposed to give Adams a warranty deed to the marital home located at 20 Thompson Road, Keesville free and clear of any liens.  Supposedly, a warranty deed with a

|  | lien covenant was provided to her.  Adams' complains that Bracy, who notarized the deed, placed a lien covenant within the deed to protect Dixon's debt, which is in contravention of a court order. |
|---|---|
| *Robert Davis* | NPB,  particularly Bracy, represented Davis during his divorce of the Plaintiff.  Further, NPB attempted to represent Davis as a creditor in Adams' Bankruptcy but ultimately that representation was withdrawn because of a potential conflict of interest. |
| *The Loremans* | Donald and Carolyn Loreman were the former owners of the Front Street property who eventually became tenants in the same property when it was owned by Adams. |
| *The Smiths* | Kathyrn and Kenneth Smith were partners of Adams for a brief period of time.  Adams named them as defendants in a fraudulent conveyance action commenced in the Northern District of New York Bankruptcy proceeding.   NPB represented the Smiths during this proceeding. |
| *Wm. Seaver* |  is a Village of Keeseville employee.   Bracy may have represented Seaver during a divorce. Seaver was a tenant at Front Street when the property was owned by Adams. |
| *Karen Marie Adams* | the Plaintiff. |

*See infra* Part I.B.

A.  Litigation History

As noted above, Adams brought a § 1983 action in this Court in April 2007 against a legion of defendants. NPB was identified throughout the initial Complaint as a Defendant who conspired with others to deprive Adams of her property and caused her irreparable harm. Dkt. No. 1, Compl. As a component of Adams' *in forma pauperis* application, the Honorable Lawrence E. Kahn, Senior United States District Court Judge conducted a review of her First Amended Complaint.  In a Memorandum-Decision and Order, dated May 24, 2007, Judge Kahn, *inter alia*, dismissed the constitutional claims against private actors, including NPB and Bracy, for failing to show a nexus

between New York State and the Village of Keeseville, yet permitting Adams an opportunity to file an amended complaint to "allege claims of misconduct or wrongdoing against Defendants over which this Court may properly exercise jurisdiction."  Dkt. No. 5 at pp. 5 & 11.  As we know, Adams has since filed a Second and a Third Amended Complaint, but NPB is not named as a defendant.

### B.  NPB and Defendants[5]

#### 1.  Loremans

The Loremans were the previous owners of 1707-1709 Front Street, which they sold to Adams shortly after a fire at the premises.  The basis for the sale was that the insurance funds were inadequate to fully reimburse the Loremans for their loss and they were without resources to fully restore the property to its previous splendor.  In order to renovate the structure, Adams sought funding from the Village of Keeseville.  NPB represented the Loremans on the transfer of property. As a part of the closing, the Loremans were supposed to provide Adams with executed warranty documents, which to this day she has not received.  Apparently these warranty documents would have been dispositive as to the leasing arrangement struck by Adams and the Loremans.  Further, the Loremans, on the advice of their counsel, refused to sign Adams' proposed lease.  Attorney Bracy presented another commercial lease, which the parties ultimately executed.

Because the Loremans failed to meet the terms of the revised lease, Adams attempted to evict

---

[5] There is a torrent of facts alleged against each of the parties about to be discussed.  Not all of these allegations and contentions, which are innumerable, are germane as to whether NPB shall be disqualified as attorneys for the Smiths. We have taken considerable liberty in sifting through the multitudinous of charges and complaints with the intention of distilling the discussion to only those facts relevant in describing relationships, confrontations, and NPB's possible role as legal counselor.

them during March 2004.  With that effort being largely unsuccessful, Adams commenced another eviction proceeding against the Loremans, which eventually went to trial, at which the Loremans were represented by Bracy.  Concurrently, the Loremans filed an action in the same town court for the return of the security deposit.  During the course of the trial, Adams swears that Bracy said loudly to her attorney that "we've been trying to starve her out for so long we're amazed she can afford you."  It is unclear whether the town justice ever issued a judgment of eviction.  *See generally* Third Am. Compl. at ¶¶ 23-44.

### 2.  The Smiths

While the eviction proceeding was moving towards trial, the Loremans spoke with the Smiths about the purchase of their launderette.  As the prospect to purchase the launderette dimmed, the Smiths eventually approached Adams about entering into a partnership to manage and own the entire Front Street property.  Consequently, the parties entered into a partnership on December 21, 2004, and this partnership evolved into Adams selling the property to the Smiths, while the Smiths attempted to refinance the mortgage.  The partnership agreement also included evicting the Loremans, allowing Adams to operate her Bed and Breakfast out of the Front Street Property, and the partners operating a tea shop.  During any of these transactions with the Smiths, Adams does not mention the role of a lawyer, and certainly no mention of NPB being involved, except to the extent of representing the Loremans while Adams and the Smiths attempted to evict them.  On September 6, 2005, title passed to the Smiths, the parties executed a lease, and Adams held a purchase money mortgage.  Adams claims that the Smiths defaulted on the loan and rather than evict the Loremans as agreed in the partnership agreement, they locked her out of the building.  Further, Adams asserts that the Loremans also converted some of her personal property.

In 2006, Adams filed for bankruptcy protection in this District.  Civ. Case No. 06-90118.
As a part of the bankruptcy, Adams, along with the Chapter 13 trustee, commenced a fraudulent
conveyance action against the Smiths.  NPB and Attorney Fisher, of counsel, defended the Smiths
during those proceedings, which was ultimately discontinued on procedural grounds.  *See generally*
Third Am. Compl. at ¶¶ 80-125.

### 3.  William Seaver

Adam contends that Seaver, as a Village employee, conspired with the Loremans against her,
and that when he was a tenant in the Front Street property he allowed the Loremans and others
unauthorized access.  Adam also posits that some time ago NPB represented Seaver on a divorce.
During oral argument before this Court, Attorney Fisher represented that he has been unable to
confirm that the firm had in fact represented Seaver.  *See* Dkt. No. 129 at p. 6.

### 4.  Robert Davis and Rocky Dixon

Mr. Davis is Adams' former husband and Rocky Dixon is a former creditor of Davis.
Neither Dixon nor Davis are defendants, but both  are erstwhile clients of Attorney Bracy.  As to
Davis, Bracy represented him in his divorce of Adams and related proceedings.  But for a conflict
of interest with another creditor, NPB would have represented Davis on his creditor claims against
Adams.  *See infra* note 8.  Adams affirms that as a part of the divorce Davis was supposed to give
her a warranty deed free of any liens on 20 Thompson Road, Keeseville, the marital residence.
Ostensibly, Davis owed Dixon approximately $1800 and a mortgage company another $5200.
Rather than receive a warranty deed as directed by a court, Bracy drafted and filed with the Clerk
of the Court a warranty deed with a lien covenant which in effect caused these two debts to become
liens on the marital property.  Adams also notes that Davis and Attorney Bracy are apparently close

friends.

### 5.  Karen Marie Adams

In addition to complaining that Attorney Bracy and NPB were inconsiderate, ill-tempered, mean spirited, slanderous, led a well-orchestrated attack against her for more than five years, may have conducted other nefarious and illegal acts during this period, and assisted all of the other Defendants in some form or fashion in depriving her of her property and causing her financial and physical injury, Adams argues that Bracy was her attorney during a lease negotiation session with the Loremans.  It appears that Adams presented a lease to the Loremans, in a format Bracy did not like.  He wanted and succeeded in substituting another "commercial" lease.  Also at this time, Bracy held a power of attorney of the Loremans while they were away.  Adams charges that during their discussion on the lease, "Bracy assured [her] that the proposed commercial lease was 'legitimate' and 'a standard commercial lease' . . . [and] promised . . . to represent [her] interests and be a mediator with respect to the lease[.]"  Dkt. No. 129 at pp. 5-6.  For Adams, Bracy's representation or overture is tantamount to simultaneous representation and thus a conflict of interest.

### C. The Smiths' Opposition

Attorney Bracy, who is in the eye of this storm, avers that he has "never represented the plaintiff at any time or in any type of action, nor ha[s] [he] ever communicated any such sentiment to the plaintiff or given the plaintiff any reason to suspect otherwise."  Bracy Affirm. at ¶ 5.  He also notes that neither he nor the firm have obtained or had access to Adams' confidential communications, documents, or information.  *Id*. at ¶ 6.  He acknowledges that the firm has represented the Smiths and Loremans at different times and denies that either he or the firm has represented Defendants Seaver or William O'Connor.  *Id*. at ¶¶ 8 & 10.  Lastly, he observes that at

all times relevant to Adams, his clients' interests were completely adverse to hers, and notes that all these alleged ethical violations concidentally occurred when his clients had defeated Adams in all of her actions against them. *Id.* at ¶¶ 9 & 12.

The Smiths pray that the Court will not disqualify their attorney. The Smiths have had a long standing professional relationship with Attorney Fisher. With respect to this litigation, they hired NPB primarily because the firm is quite familiar with the complexity and factual entanglements of Adams' claims and felt that retaining a less informed attorney outside of the north country would be too costly. They acknowledge being aware of NPB's prior representations of other parties, such as the Loremans, but they do not believe there is any conflict of interest.

## II. DISCUSSION

### A.  The General Legal Principles

Although there are a horde of ethical violations registered by Adams against NPB and Bracy, the paramount complaint is that NPB is engaged in improper concurrent and successive representations of certain parties to this litigation. With a complaint such as this, the primary concern is the revelation of confidences once shared with an attorney. "Ordinarily an attorney may not knowingly reveal a confidence of his client or use a confidence of his client to the disadvantage of the client." *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir. 1983) (citations omitted). There is also the general legal proposition that an attorney should not "appear for and oppose a client on substantially related matters when the client's interests are adverse." *Solow v. W.R. Grace & Co.*, 83 N.Y.2d 303, 306 (N.Y. Ct. App. 1994) (citation omitted); *Kassis v. Teacher's Ins. and Annuity*

*Ass'n*, 93 N.Y.2d 611, 615 (N.Y. Ct. App. 1999).[6]

A motion to disqualify an attorney is within the broad discretion of the court. *Cheng v. GAF Corp.*, 631 F.2d 1052, 1055 (2d Cir.), *judgment vacated on other grounds*, 450 U.S. 903 (1981) (noting that a court's ruling will not be overturned absent an abuse of discretion determination). Since disqualification may impose a serious impact on a party's right to an attorney of his choice, it should only be imposed when continued representation may pose a significant risk of taint upon the trial. *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981). An attorney's conflict of interest may disqualify the entire firm. *United States v. Hasarafally*, 529 F.3d 125, 128 (2d Cir. 2008). Recently, the Second Circuit has comprehensively summarized instructions to trial courts on the guiding legal principles in this arena:

> The authority of federal courts to disqualify attorneys derives from their inherent power to "preserve the integrity of the adversary process." *Bd. of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979). In exercising this power, we have attempted to balance "a client's right freely to choose his counsel" against "the need to maintain the highest standards of the profession." *Gov't of India v. Cook Indus., Inc.,* 569 F.2d 737, 739 (2d Cir. 1978); *see also Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562, 564-65 (2d Cir. 1973). Although our decisions on disqualification motions often benefit from guidance offered by the American Bar Association (ABA) and state disciplinary rules, *see, e.g., Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 227 n. 2 (2d Cir. 1977); *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 753 (2d Cir. 1975), such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification, *see Nyquist,* 590 F.2d at 1246 (disqualification is only warranted where "an attorney's conduct tends to taint the underlying trial," because other ethical violations can be left to federal and state disciplinary mechanisms (internal quotation marks omitted)).

One recognized form of taint arises when an attorney places himself in a position

---

[6] The related New York Disciplinary Rule 5-108 reads, in part, as follows:
[A] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure . . . [t]hereafter represent another person in the same or a substantially related matter in **which that person's interests are materially adverse to the interests of the former client**. N.Y. COMP. CODES R. & REGS. tit. 22 § 1200.27(a)(1) (emphasis added).

where he could use a client's privileged information against that client. The standard for disqualification varies depending on whether the representation is concurrent or successive. In cases of concurrent representation, we have ruled it is "prima facie improper" for an attorney to simultaneously represent a client and another party with interests directly adverse to that client. *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir. 1976). The attorney "must be prepared to show, at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation." *Id.* In cases of successive representation, we have held that an attorney may be disqualified if:

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client. *Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir. 1983).

An attorney's conflicts are ordinarily imputed to his firm based on the presumption that "associated" attorneys share client confidences. For example, New York Disciplinary Rule 5-105 states: "While lawyers are associated in a law firm, none of them shall knowingly accept or continue employment when any one of them practicing alone would be prohibited from doing so [under specific ethics rules, including those governing conflicts arising from concurrent and successive representations]." N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.24(d) ("Disciplinary Rule 5-105"). As discussed below, however, attorneys with limited links to a firm are not always considered to be "associated" with the firm for purposes of conflict imputation.

Although some courts have treated the presumption that confidences are shared within a firm as irrebuttable, *see, e.g., In re American Airlines, Inc.,* 972 F.2d 605, 614 n. 1 (5th Cir. 1992), there is a "strong trend," which we join, toward allowing the presumption of confidence sharing within a firm to be rebutted, *United States ex rel. Lord Elec. Co. v. Titan Pac. Constr. Corp.,* 637 F. Supp. 1556, 1564 (W.D.Wash. 1986) (citing cases); *see also, e.g., Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222, 224 (6th Cir. 1988); *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Labs., Inc.,* 607 F.2d 186, 197 (7th Cir. 1979) (en banc); *Roberts & Schaefer Co. v. San-Con, Inc.,* 898 F. Supp. 356, 362-63 (S.D.W.Va. 1995) (recognizing trend but criticizing it); *Kassis v. Teacher's Ins. & Annuity Ass'n,* 93 N.Y.2d 611, 695 N.Y.S.2d 515, 717 N.E.2d 674, 677-78 (1999); *Solow v. W.R. Grace & Co.,* 83 N.Y.2d 303, 610 N.Y.S.2d 128, 632 N.E.2d 437, 442 (1994).

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream,* 409 F.3d 127, 132-33 (2d Cir. 2005) (alterations, emphasis, and quotations marks in original).

In successive representation particularly, law firms, especially large firms, shall have the

right to rebut the presumption and present facts, *inter alia*, that (1) the former client's confidences have been protected, or (2) the firm does not possess nor has acquired the clients' confidences or secrets, or (3) there are limited links to a firm that may possess client confidences, or (4) the relationship is too remote, too attenuated to matter, or (5) that if any information was acquired that it is "unlikely to be significant or material in the litigation." *Kassis v. Teacher's Ins. and Annuity Ass'n*, 93 N.Y.2d at 617 (citing *Solow v. W.R. Grace*, 83 N.Y.2d at 313-14) (finding that a large firm should have the ability to rebut any presumption of disqualification); *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d at 133-36 (observing that any presumption depends on the closeness and the extent of the relationship).

Motions to disqualify are viewed with disfavor and the party seeking disqualification must meet a high standard of proof before disqualification will be granted. *Evans v. Artek Sys. Corp.*, 715 F.2d at 791 (observing that there is "a particularly trenchant reasons for requiring a high standard of proof"); *Human Elec., Inc. v. Emerson Radio Corp.*, 375 F. Supp. 2d 102, 105 (N.D.N.Y. 2004); *United States v. Salvagno*, 2003 WL 21939629, at *5 (N.D.N.Y. Mar. 4, 2003). Disqualification motions are approached with suspicion because there looms the overarching element that they are nothing more than tactical maneuvers. *D.R.T., Inc. v. Universal City Studios, Inc.*, 2003 WL 1948798, at *2-3 (S.D.N.Y. Apr. 24, 2003).

B.  The Analysis

We can generally categorize Adams' reasons for disqualifying NPB as follows: (1) possible prior, concurrent representation of her and the Loremans; (2) possible successive representations of her and the Loremans and the Smiths; (3) successive representation of the Loremans and Smiths; (4) successive representation between Seaver and the Loremans and Smiths; and (5) other ethical

*-12-*

improprieties.  Notwithstanding these several categories of allegations, based upon the record before

this Court, Adams has failed to meet the high standard of proof required before disqualification of

a lawyer is granted.

We review with great circumspection any allegation that any attorney may be in a position

of gaining a party's confidential communication and then using those confidences against that same

party in subsequent litigation.  But, in this case, the record is deplete of facts which would support

Adams' contention that she entered into an attorney client relationship with NPB or that NPB

obtained confidential information that could be used against Adams.

The record indicates that Adams has had many contacts with NPB over the years, mostly

unpleasant legal encounters on various matters.  Adams does not claim that NPB represented her

during those confrontational and hostile contacts.  However, Adams' contention that Bracy was her

attorney during a lease negotiation session with the Loremans requires our cautious review.  To

reiterate, Adams presented a lease to the Loremans, which Bracy rejected.   In its stead, Bracy

wanted to use another commercial lease.  Also at this time, Bracy had a power of attorney to act on

behalf of the Loremans.  Adams charges that during their discussion on the lease, "Bracy assured

[her] that the proposed commercial lease was 'legitimate' and 'a standard commercial lease' . . .

[and] promised . . . to represent [her] interests and be a mediator with respect to the lease[.]"  For

various reasons, which we now discuss, Adams' postulation that Bracy was serving as her attorney

is  problematic.

First, we must scrutinize whether, in any context, Bracy's overture to serve as a mediator

with respect to a lease rises to the level of creating an attorney-client relationship.  To assist in this

analysis, we turn to the standards employed by many of the district courts within the Second Circuit.

These district courts have identified six factors upon which to judge whether an attorney-client relationship may or may not have existed.  These six factors are

> 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

*Medical Diagnostic Imaging, PLLC v. CareCore Nat., LLC,* 542 F. Supp. 2d 296, 307 (S.D.N.Y. 2008) (citations and internal quotation marks omitted).

We accept that this litigation is substantially related to other previous litigation involving Adams and one or more of the named Defendants.  But substantially related litigation is not the talisman in determining whether Attorney Bracy or NPB served as her attorney.  Rather, we are required to examine the substance of the relationship.  And the Court is not bound by personal conclusions and Adams' strong convictions as to whether she believes that an attorney client relationship existed.  The test is whether that belief is reasonable.  We know from this copious record that there was neither a retainer agreement, fee arrangement nor a fee paid by Adams to NPB. Adams admits that she "lacks a plethora of evidence to support the fact that Bracy offered to represent both Loremans and [her] with respect to the lease issues," and has "no bill which would indicate that [she] ever paid him for legal services[.]"  Dkt. No. 137, Reply Mem. of Law at p. 4. Even during oral argument, Adams could not refer us to any confidential communication that she may have shared with Attorney Bracy, any legal advice that he may have given her, any showing that he in fact mediated the legal dispute, any other indicia of a professional relationship, nor could she explain how NPB's subsequent relationship of any other party would cause her a substantial disadvantage in this current litigation, even though we recognize, based upon their previous

antagonistic experience, that their respective hostilities remain.  Furthermore, Bracy avers that he has never represented Adams and never made any statement that would lead Adams to believe that he represented her at any time.  The record contains letters published by Bracy to various courts and to Adams that he represented the Loremans in matters inimical to Adams' claims and/or defenses. Dkt. No. 129, Ex A. at p. 2.

The pivotal point in this discussion is not the need for an express attorney-client relationship to exist but rather an attorney's access to secrets or confidences of a possible former client.  *Human Elec., Inc. v. Emerson Radio Corp.*, 375 F. Supp. 2d at 106.  Bracy affirms that he has never had access to Adams' confidential confirmation, even now.  And Adams has not been able to clearly orient us as to how NPB may have access to her confidential information, other than information that she shared willingly with the Defendants when they were on more friendly terms.[7]  She also avers that "[t]he secrets, information, and confidences at issue are not necessarily those obtained due to representation of me, but were usually questionably obtained, or were from one client to another, shared freely in NPB's office and among its clients."  Dkt. No. 133, Pl's Reply at ¶12.  The "mediate" conversation, if such occurred, still lacks substantialness.   The brevity of the conversation alone defies an attorney-client communication.  *Hempstead Video v. Vill. of Valley Stream*, 409 F.3d at 139 (finding that a ten minute conversation with a law firm partner without retaining them did not contribute towards a disqualification).

---

[7] Adams makes reference to her ex-husband and NPB having access to her tax returns.  Access to these returns may have been either intentionally or unwittingly provided by family court.  Access to these discrete returns, if accepted as true, does not promote the notion that NPB has access to confidential communication, documents, or information that can be turned against Adams to her detriment.

During oral argument, Adams stated that there were times when she and Kathryn Smith shared sensitive and intimate background information about themselves.  Notwithstanding the potential disclosure of these intimate details at trial, such conversations can not be imputed to NPB in order to disqualify them from representing Ms. Smith.

Based upon the record before us, we find that Adams was not a former client of NPB, that it is very unlikely that NPB would have access to her confidential information, that her belief that Bracy represented her during the Loremans' lease negotiation is not reasonable, and that she failed to meet the standard of proof demanded in disqualification motions.

As to NPB representing Rocky Dixon and Robert Davis, we fail to see, from this record, how those representations have any relevance or bearing on this case. Although the failure to provide the correct type of deed, with all of its unexplained lien implications aside, during a matrimonial dispute may be raised at trial, it is inconsequential in determining whether the law firm involved with these specific clients should be disqualified. This is evidently one of those situations where a court is "not in a position either to condone actions or punish attorneys for actions that do not affect the case before the court." *Human Elec., Inc. v. Emerson Radio Corp.*, 375 F. Supp. 2d at 113. These matters are too attenuated and too remote from the real issue of whether Adams' constitutional rights were violated or whether the named Defendants caused Adams harm under a common law or any other statutory cause of action.[8]

Adams raises that there exists another successive representation circumstance within this case, which the Court should rigorously review. That successive representation concerns the Loremans, who are currently represented by independent counsel, and the Smiths. During previous litigation, the Smiths sided with Adams in terms of evicting the Loremans, who, at that time, were vigorously represented by NPB. Subsequently, during Adams' bankruptcy, NPB represented the Loremans as creditors and defended the Smiths on a fraudulent conveyance action. Now NPB is

---

[8] Ironically, NPB was prepared to represent Mr. Davis on a creditor's claim against Adams. When NPB realized that they could not represent two creditors in the same bankruptcy proceeding, they withdrew from that representation.

*-16-*

representing the Smiths while the Loremans are Co-Defendants.

NPB submits that neither the Loremans nor Smiths have registered any conflict of interest complaint or demanded a disqualification based upon this successive representation scenario. NPB also posits that Adams does not have standing to raise another client's or party's potential conflict of interest in order to gain the attorney's disqualification. NPB is wrong in this regard. When presented with the possibility of a potential or actual conflict of interest, a court must "satisfy itself that no conflict exists or at least provide notice to the affected party if one does." *Dunton v. County of Suffolk*, 729 F.2d 903, 909 (2d Cir.), *modified*, 748 F.2d 69 (1984). As former Chief United States District Judge Munson explained, "[t]his duty arises out of the court's 'continuing obligation to supervise the members of its Bar,' [*Dunton v. County of Suffolk*, 729 F.2d at 909], as well as its responsibility 'to exercise that degree of control required by the facts and circumstances of each case to assure the litigants of a fair trial.' *Koufakis v. Carvel*, 425 F.2d 892, 900-01 (2d Cir. 1970)." *The Vegetable Kingdom, Inc. v. Katzen*, 653 F. Supp. 917, 923 (N.D.N.Y. 1987). Given the court's oversight obligation, a motion to disqualify an attorney, even if brought by an unaffected party, is an appropriate means by which to bring the conflict issue to the court's attention. *Id.*;[9] *see also*, *e.g.*, *In re Fischer*, 202 B.R. 341, 352-53 (E.D.N.Y. 1996) (reversing bankruptcy court's denial of attorney disqualification motion insofar as it rested on a theory of lack of standing). In this respect, Adams is within her rights and obligation to bring to the Court a potential conflict of interest that may not affect her, but others.

The problem is this: other than an appearance of a potential conflict of interest as to this

---

[9] Attorneys not only have standing to bring these motions, but also have the ethical duty to raise the issue before the court regardless of their interest in the alleged conflict. *SMI Indust. Canada Ltd. v. Caelter Indust., Inc.*, 586 F. Supp. 808, 815 (N.D.N.Y. 1984) (noting that Disciplinary Rule 1-103(A) "confers standing on any attorney to challenge a lawyer's representation of a client when he is privy to facts which justify disqualification").

matter, the record does not reveal the graveness of any such conflict.  We are unaware what communications may be compromised, how these two parties' defenses in this matter have been endangered, and what substantial disadvantage they may suffer as a result of this successive representation.  We can say with confidence that the Smiths would not raise this potential conflict of interest insofar as they are vehemently fighting to maintain NPB as their attorney.  They have been apprised of the potential conflict of interest and implicitly waive that conflict.  We have not heard from the Loremans who are represented by separate counsel but the Smiths' counsel represents that they have been informed about this successive representation.  Dkt. No. 133, Mem. of Law at p. 7.  Indeed, the Loremans may feel otherwise and would like an opportunity to address this successive representation situation.  We are unable to fathom what conceivably could have been said to their erstwhile lawyers that would reverberate against them now.  On this record, Adams has failed to bolster her Motion to Disqualify NPB aided by the Loremans and the Smiths' relationship with their former attorneys.  On this account, Adams' Motion fails.

Adams' Motion is replete with allegations of continuous ethical violations perpetrated by NPB and Attorney Bracy.[10]  It is fair to say that there is no love lost between NPB and Adams and the hostilities have now risen to a virulent level.[11]  Adams harbors a pungent bitterness against Bracy

---

[10] Adams complains that the litany of offenses committed by Bracy violate NYCRR §§ 1200.35(a), 1200.26(b), 1200.27, and 1200.24, as well as others. Dkt. No. 129, Mem. of Law at p. 2, Adams' Aff. at ¶¶ 3, 4, 59, 65, 70, & 71. Moreover, Adams opines that Bracy and NPB should be a party to this action. Reply Mem. of Law at p. 9.

[11] The risk that an attorney may cross-examine a "former" client is not a sufficient reason, standing alone, to disqualify an attorney. *Medical Diagnostic Imaging, LLC, v. CareCore National, LLC*, 542 F. Supp. 2d 296, 316 (S.D.N.Y. 2008) (citation omitted). During the eviction trial, Bracy cross examined Adams. Adams exclaims that Bracy made a "mockery of her" but she does not state that he used any confidences that he may have gleaned from communicating with her. Reply Aff. at ¶ 23.

NPB and Bracy accuse Adams of fabrication, slander, abuse of the court process and conducting a vendetta against their clients.  *See generally* Dkt. No. 133, Mem. of Law & Bracey Affirm.

for all the perceived maltreatment and slights over the past five years.  Yet, we are not in a position

to say that there have been any ethical violations.  Our role is to preserve the integrity of the

adversary process and guarantee, to the extent that we can, that a trial is not tainted by

unprofessional and questionable ethical behavior.  But we must remember that the disciplinary rules

only offer guidance to a court when considering a motion to disqualify and "not every violation of

a disciplinary rule will necessarily lead to disqualification[.]"  *Hempstead Video v. Vill. of Valley

Stream*, 409 F.3d at 132.  In fact, courts have been reluctant to disqualify an attorney "despite

misgivings about the attorney's conduct."  *Bd. of Ed. of City of New York v. Nyquist*, 590 F.2d at

1246.  And there is no need to be concerned about other kinds of ethical violations that merely

constitute an appearance of impropriety when the proof is "simply too slender a reed."  *Id*. at 1246;

*see also Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir. 1980) (quoting *Bd. of Ed. of City of New

York*).  Much like the discussions above, Adams has failed to meet her burden with this aspect of

her Motion.[12]

Being mindful that the court has the ultimate responsibility to make sure conflicts and

improprieties do not taint a trial in this matter, there is yet another issue we must address, which was

not raised nor discussed in either the Motion or the Smiths' Opposition.  Taking stock that when this

lawsuit was initially commenced NPB was named as a defendant, reading the Complaint seems to

infer that NPB and Attorney Bracy were the axis of a conspiracy to violate Adams' constitutional

rights, caused a breach of a contract, and committed other acts of fraud.  *See generally* Dkt. No. 1,

Compl.  The claims were dismissed against NPB because the Complaint did not allege sufficient

---

[12]  If there were violations of disciplinary rules or ethical canons, the matter may be presented to the New York State Professional Standards Office.  *Bd. of Educ. of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979) (noting that less serious ethical violation should be referred to the "federal and state comprehensive disciplinary machinery").

facts to tie NPB with the state actor. When Adams amended her Complaint, as directed by a

Memorandum-Decision and Order, NPB was not named as a party. That notwithstanding, Adams

has woven NPB and Attorney Bracy's representations of others throughout the entire fabric of her

lawsuit. NPB and Attorney Bracy are mentioned throughout the chronology of events that underline

her actions against these ten Defendants. In an attempt to determine whether the witness-advocate

rule is being invoked, this Court asked Adams during oral argument whether she intends to call

Attorney Bracy as a witness. At first she demurred and stated probably not. When raised later in

oral argument, her position changed and she stated that she intends on calling Bracy as a witness,

without providing details on the nature of his anticipated testimony. Because of her decision, albeit

equivocal, we must review whether the witness-advocate rule is applicable at this juncture of the

case.

The framework for the advocate-witness rule is found in Disciplinary Rule 5-102[b] which

fundamentally states in part

> [i]f after undertaking employment in contemplated or pending litigation, a lawyer
> learns or it is obvious that the lawyer . . . may be called as a witness on a significant
> issue other than on behalf of the client, the lawyer may continue the representation
> until it is apparent that the testimony is or may be prejudicial to the client at which
> point the lawyer . . . must withdraw acting as an advocate before the tribunal.

N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.21[d].

As often stated within this Circuit, the New York State Code of Professional Responsibilities only

serve as a guideline. *NCK Org. Ltd. v. Bregman*, 542 F.2d 128, 129 n.2 (2d Cir. 1976) (cited by

*Forrest v. Par Pharm., Inc*., 46 F. Supp. 2d 244, 247 (S.D.N.Y. 1999)); *S & S. Hotel Ventures Ltd.

P'ship v. 777 S.H. Corp.*, 69 N.Y.2d 437 (N.Y. Ct. App. 1987) (recognizing that the disciplinary

rules are only guidance and not mandatory). To support a motion for disqualification premised upon

the invocation of the advocate-witness rule, the movant must meet a high burden of establishing that

*-20-*

the attorney's testimony is vital and necessary at trial and that testimony is substantially prejudicial and adverse to his client. *Forrest v. Par Pharm. Inc*., 46 F. Supp. 2d at 247-48 ("[T]he projected testimony of a lawyer . . . [must be] sufficiently adverse to the factual assertions or account of events offered on behalf of the client." (citation and internal quotation marks omitted)); *Davin v. JMAM, LLC*, 27 A.D.3d 371 (N.Y. App. Div. 1st Dep't 2006). There are factors, even variables, interjected into the calculus of whether an attorney's testimony is necessary at trial. For instance, an adequate discussion of the issues by the client may diffuse the necessity of an attorney's testimony, diminishing the demand for disqualification. *Peggy Walz, Inc. v. Liz Wain, Inc.*, 1996 WL 88556, at *4 (S.D.N.Y. Mar. 1, 2006) (disqualifying attorney for reasons other than the advocate-witness rule); *Sea Tow Int'l Inc. v. Pontin*, 2007 WL 4180679, at *2 (E.D.N.Y. Nov. 19, 2007) (quoting *Forrest v. Par Pharm. Inc*., 46 F. Supp. 2d at 248 for the proposition that "[t]estimony may be relevant and even highly useful but still not strictly necessary").

Reflecting upon the guiding principles of DR 5-102, this Court questions whether the Plaintiff is the appropriate party to invoke the advocate-witness rule to beget the dismissal of counsel. As the Disciplinary Rule makes pellucid, the lawyer may continue to represent the client until such time as the client is prejudiced. Without knowing whether a client is substantially prejudiced, an advocate-witness-driven motion to disqualify is premature. Without a deposition of the parties to appreciate the orbit of this purported advice and actions of counsel and possible attorney testimony, the motion is underdeveloped. *Occidental Hotels Mgmt. B.V. v. Westbrook Allegro, I.L.C.*, 440 F. Supp. 2d 303, 315 (S.D.N.Y. 2006).

We must also take into account that there are possible situations where an attorney may testify at trial and still serve as a trial attorney. Discipline Rule 5-102(a) allows an attorney to act

as an advocate and also testify, *inter alia*, "if disqualification as an advocate would work a substantial hardship on the client because of the distinctive value of the lawyer as a counsel in the particular case." *Sea Tow Int'l, Inc. v. Pontin*, 2007 WL 4180679, at *2 n.2 (quoting DR 5-102(a).

Without a far greater showing of necessity, we are constrained to invoke the advocate-witness rule as it may apply to Attorney Bracy, and invariably NPB. Even conferring the most liberal construction upon Adams' Motion to Disqualify, her supporting papers remain speculative and conclusory especially as to Bracy's exclusive personal knowledge of the issues, which cannot be provided by other parties. *Zutler v. Drivershield Corp.*, 15 A.D.3d 397 (N.Y. App. 2d Dep't 2005). Even if these Motion papers were to show that Bracy's testimony was necessary and his disqualification may be in order, the disqualification of his entire firm may not necessarily follow. *Occidental Hotels Mgmt. B.V. v. Westbrook Allegro, L.L.C.*, 440 F. Supp. 2d at 315; *Davin V. JMAM*, LLC, 27 A.D.3d 371. Adams has failed to meet her heavy burden and demonstrate, at this stage of the litigation, any justification to grant this Motion to Disqualify on this rule. *See M.K.B. v. Eggleston*, 414 F. Supp. 2d 469 (S.D.N.Y. 2006); *Strongback Corp. v. N.E.D. Cambridge Ave. Dev. Corp.*, 32 A.D.3d 793 (N.Y. App. Div. 1st Dep't 2006); *Old Saratoga Square P'ship v. Compton*, 19 A.D.3d 823, 825 (N.Y. App. Div. 3d Dep't 2005).

## III. CONCLUSION

Based upon the record before this Court, Adams has failed to meet the high standard of proof. In the Smiths' Opposition, they seek costs of defending against this Motion. Although we find that Adams may not have met her burden, we do not find that her Motion is frivolous or an abuse. Therefore, the Smiths' request for fees and expenses is **denied**. Even though we did not find, on this record, that the Loremans' and Smiths' successive representation scenario would lead us to

disqualify NPB, we are not foreclosing either the Loremans or the Smiths from submiting such a motion if they indeed believe that they may be placed at a substantial disadvantage in this litigation because of previous legal representation.  The evidence concerning whether the advocate-witness rule should apply has not been fully developed at this stage of the litigation.

Because of heightened concern that these Motion papers would reveal sensitive and confidential information, this Court allowed the parties to file their respective pleadings and exhibits under seal.  We have determined that no such sensitive, confidential or privileged communications were revealed in these filings.  "It is well established that the public and the press have a qualified First Amendment [and common law right] to attend judicial proceedings and to access certain judicial documents." *Lugosch v. Pyramid*, 435 F.3d 110, 120 (2d Cir. 2006).  This right to have access to judicial documents is premised upon the public's right to scrutinize the conduct of the court on the legal affairs before it and to know the content of a person's evidence.  However, before a document that has been reviewed by the court is revealed to the public at large, the Court must balance the public's First Amendment rights against any paramount right to keep that document privileged and confidential.  In our case, since there is no privileged document or any showing of an apparent paramount right to maintain secrecy over the contents of this Motion, all of the documents reviewed by this Court should no longer remain under seal.

Lastly, the stay of this litigation pending a decision on this Motion shall be lifted.

For the reasons stated herein, it is hereby

**ORDERED,** that Adams' Motion to Disqualify the law firm of Niles, Piller, & Bracy PLLC (Dkt. No. 129) is **denied**; and it is further

**ORDERED**, that the Smith's Request for the award of reasonable attorney fees and costs

(Dkt. No. 133) is **denied**; and it is further

     **ORDERED**, that all of the papers, exhibits, pleadings, and the like (Dkt. Nos. 129, 133, and 137) shall be unsealed and filed on the case docket; and it is further

     **ORDERED**, that the Stay of this Litigation is now lifted and the parties shall proceed to a Rule 16 Conference.  The Rule 16 Conference shall be held on August 27, 2008, at 9:30 a.m., before this Court.  The parties need not meet and confer, pursuant to Fed. R. Civ. P. 26(f), in order to prepare a joint civil case management plan.  The Court will relieve the parties of the obligation to file a joint civil case management plan.  The parties may have the option of appearing in person or participating by telephone during this Rule 16 Conference. Those parties wishing to participate by telephone are directed to electronically file the telephone number by which they can be reached for the telephone conference.[13]

     **IT IS SO ORDERED**.

Date:  August 8, 2008
       Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge

---

[13] Because of the large number of defendants who may want to participate by telephone, we may be required to have to set up a telephone call-in center.  We will advise the parties if such requirement is deemed necessary.