IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

KAREN MARIE ADAMS

                    Plaintiff,

      v.

                                                          8:07-cv-0452 (LEK/RFT)


KATHRYN WILSON SMITH, KENNETH L. SMITH,
DONALD LOREMAN, CAROLYN LOREMAN,
MARK J. WHITNEY, *individually and as Mayor of the
Village of Keeseville,* WILLIAM SEAVER, *individually
and as an employee  of the Village of Keeseville Court*,
WILLIAM O'CONNER,  *individually and as an employee
of the Village of Keeseville,* THE VILLAGE OF
KEESEVILLE, STANDARD FEDERAL BANK, *as
successor by merger to  ABN AMRO Mortgage Group,*
BAYVIEW LOAN SERVICING, LLC,


                    Defendants.
_____


**MEMORANDUM-DECISION AND ORDER**


**I.      INTRODUCTION**

        Presently before the Court are eleven Motions pertaining to the above-captioned action by

*pro se* Plaintiff Karen Marie Adams ("Plaintiff").  Plaintiff's Third Amended Complaint

("Complaint") asserts, *inter alia*, several claims for federal civil rights violations as well as a variety

of state law claims.  The Defendants, individually or in designated groupings, have moved to

dismiss Plaintiff's Complaint or claims contained therein; additionally, a cross-Motion to vacate a

1

notice of pendency filed in Essex County, New York, concerning the property identified as located at 20 Thompson Road, Keeseville, New York, has been brought before the Court.  Plaintiff, subsequent to completion of briefing relating to Defendants' Motions to dismiss, has moved to supplement her pleadings.  After reviewing the background of this case, the Court will address these pending Motions.

## II.     BACKGROUND

Plaintiff's Complaint sets forth a highly involved factual history for her action and alleges a wide-ranging course of wrong-doing by various Defendants over a period of years.  Specific claims include equal protection, procedural due process and substantive due process violations under 42 U.S.C. § 1983, breach of contract, breach of implied-in-fact contract, breach of covenant of good faith and fair dealing, promissory estoppel, and intentional infliction of emotional distress; Plaintiff also appears to allege fraud claims, as well as to indicate that she was subject to Fair Debt Collection Practices Act and Real Estate Settlement Practices Act violations.  The Defendant parties are Donald and Carolyn Loreman ("the Loremans"); the Village of Keeseville, New York ("the Village"); Mark J. Whitney, who held the position of Mayor of the Village during a period relevant for this litigation, William O'Connor, who was employed by the Village during a period relevant for this litigation, and William Seaver, who was also employed by the Village during a period relevant for this litigation (collectively, "the Keeseville Defendants"); Kathryn W. Smith and Kenneth L. Smith ("the Smiths"); Standard Federal Bank ("Standard"), the successor by merger to ABN AMRO Mortgage Group; and Bayview Loan Servicing, LLC ("Bayview").

This action initially arrived before this Court on April 26, 2007 with the filing of Plaintiff's

original *pro se* Complaint and application to proceed *in forma pauperis*.  An amended Complaint

soon followed on May 14, 2007.  Dkt. Nos. 1-2.  While *in forma pauperis* status was granted,

review of the first Complaint required the Court to dismiss a number of parties and claims based on

judicial immunity, failure to allege state action, and statute of limitations grounds.  See generally

Dkt. No. 5.  The Court ordered that Plaintiff filed a second amended complaint within thirty days.

Thereafter, on June 25, 2007, Plaintiff made such a filing, which the Court proceeded to review.

For this pleading, the Court allowed the Second Amended Complaint to proceed but dismissed

certain allegations as time-barred, dismissed the claims made pursuant 42 U.S.C. §§ 1985 and 1986

for failure to state a claim, and dismissed the Loremans and Smiths as Defendants along with a

number of other named individuals, including the now-deceased Keeseville Town Justice, George

Head.  Dkt. No. 11.  Subsequently, Plaintiff received permission to submit an amended complaint,

which resulted in the filing of the current Third Amended Complaint on January 16, 2008.  Dkt. No.

57.  On October 8, 2008, Bayview moved the Court to dismiss all claims asserted against the

company.  Dkt. No 152.  On October 9, 2008, Standard filed a Motion to dismiss the Complaint as

against the bank or strike pleadings and cancel a notice of pendency.  Dkt. No. 155.  On October 10,

2008, the Loremans and Smith Defendants each filed Motions to dismiss the Plaintiff's claims and

Complaint.  Dkt. Nos. 160, 162.  On October 11, 2008, the Keeseville Defendants moved the Court

to the dismiss the action as asserted against them.  Dkt. Nos. 165, 166.  Later, on August 21, 2009,

Plaintiff filed a Motion which purportedly seeks to supplement her pleadings.  Dkt. No. 199.  On

August 28, 2009, Standard brought a cross-Motion specifically seeking to vacate the notice of

pendency concerning the property over which the Bank and Plaintiff have been in dispute.  Dkt. No.

200.  Plaintiff, on August 27, 2008, filed a Notice of appeal as to the Court's denial of her Motion to

reconsider the Court's denial of a preliminary injunction also in relation to the property and any action by Standard to evict Plaintiff from it.  Dkt. No. 148.  The Court of Appeals for the Second Circuit issued a mandate on May 7, 2010 dismissing Plaintiff's appeal.

While Plaintiff's allegations of wrong-doing by various Defendants is wide-ranging, her suit primarily involves events surrounding the fate of the premises located at 1707-1709 Front Street, Keeseville, New York ("the Front Street building"), a "mixed-use, historic building" which Plaintiff purchased from the Loremans at a time prior to the litigation to run as, *inter alia*, a bed and breakfast.  Compl. at 6.  The Complaint provides a detailed narrative history of each Defendant's alleged interest in the building, relationship with the Plaintiff and other Defendants, and actions taken with respect to that interest and those relationships.  Plaintiff organizes the factual allegations in her Complaint, in part, by Defendant group and by topic.  The Court will relate those allegations in a similar order, and within a general chronological structure.

**a.  The Loremans and Village Defendants**

According to Plaintiff, the Loremans owned the Front Street building until fire damage and inadequate insurance recovery led to Plaintiff's purchase of the building with funding from the Village of Keeseville Revolving Loan Fund.  Id. at 6.  An agreement was executed between the Village and Plaintiff on February 27, 2003; at this time and prior to the signing, Plaintiff asserts that the funds extended were represented by the Village Defendants to be an instrument of the United States Department of Housing and Urban Development ("HUD").  Id. at 12.  Plaintiff contends that much later it was revealed that the monies were not associated with HUD, and that the Village was not acting as an agent of HUD in making the loan agreement.  Id.

The Complaint shows that problems arose almost immediately upon Plaintiff's closing with

4

the Loremans.  Plaintiff alleges that the loan involved an agreement among the Loremans, Plaintiff and Village, or Village mayor at the time, that a rapid purchase from the Loremans be completed, such that renovations would be made in time for opening the building as a business that Spring.  The Loremans would remain as tenets, occupying part of the premises to continue operation of their Keeseville Laundrette.  Yet, according to Plaintiff, the Loremans withheld executed warranty documents, refused to actually sign a lease agreement with Plaintiff or make rent payments, but all the while continued to occupy and operate their Launderette enterprise.  Id. at 6-7.  Indeed, Plaintiff alleges that "both the Loreman Defendants and the Village Defendants began engaging in harassing, oppressive and obstructive behaviors, included but not limited to, failure to make timely payments and draw downs, issuing of bogus citations, repeated unnecessary inspections daily, harassing 'slow downs' with workers and Plaintiff, slander, theft of services, theft of goods, and failure to uphold agreements."  Id.   Plaintiff alleges that Defendant O'Connor and Justice Head demanded Plaintiff provide Defendant Seaver with an apartment in the Front Street building for the purpose of monitoring her; Seaver, Plaintiff contends, let Defendant O'Connor into the premises to enable harassment through code citations and let the Loremans inside despite requests not to do so.  Id. at 45. The Loremans are alleged to have insisted to Plaintiff they negotiate some agreement with the Village that permit the Loremans to "take the building back."  Id. at 7.  Eventually, Plaintiff signed a lease offered by the Loremans, though Plaintiff alleges that non-payment and assorted breaches continued to occur. As a result, Plaintiff filed an eviction action against the Loremans in Keeseville Village Court in March of 2004.  Id. at 8.

The eviction action came before the Village Justice, George Head.  In response to the Plaintiff's first eviction attempt, he declared the "some of the required papers were missing and that

service was not proper, despite personally giving the forms to Plaintiff for filing and arranging for his bailiff William Seaver to serve the documents." Id.  Justice Head discontinued the action on this basis, and Plaintiff filed again to evict the Loremans in April of 2004.  Due to an acquiantance's death, Justice Head postponed the hearing.  Then, on the hearing date, he ruled that because the hearing should have been held within 12 days of service of the complaint and 14 days had passed, the action was dismissed.  Id.  After retaining counsel in August of 2004, Plaintiff made a third attempt to evict the Loremans at a three-day trial in December of 2004.  At that time, Plaintiff alleges that the Loremans' attorney told Plaintiff's counsel that "we've been trying to starve her out for so long, we're amazed she can afford you."  Plaintiff also describes the proceedings as demonstrating a high level of familiarity between the Loremans, Justice Head and the Mayor, Defendant Whitney, who is alleged to have entered and exited the court repeatedly to deliver notes from the Loremans.  Id. at 9.  According to Plaintiff, Justice Head concluded the trial without hearing all witnesses and stated that a ruling would follow within a few weeks.  Plaintiff complains, however, that the only ruling that eventually emerged was an unsigned statement that Plaintiff was owed some monies; it suggested arbitration, and noted that a final order would be issued later if the parties could not agree.  Plaintiff's counsel then sought re-argument and a final ruling; re-argument was eventually obtained in May of 2005, where Justice Head indicated a ruling would be imminently forthcoming.  Nonetheless, despite her requests, Plaintiff recounts that no ruling in the case ever issued.  Id.

Plaintiff further alleges that on August 27, 2005, Plaintiff met with Carolyn Loreman,who informed Plaintiff that "George said we don't have to leave unless he issues an official ruling which says we have to, and he promised he won't do that."  Loreman also allegedly stated that Mayor

Whitney "told us not to pay you any rent so he could foreclose on you and work something out with us afterwards." Id. at 10.  The Village of Keeseville Court closed following Justice Head's death in June of 2007.  Plaintiff determined that in order to receive a final ruling in her case, she would need a statement from the Village or Village attorney that the Village Court is permanently closed, Justice Head is deceased, and that the case remains pending.  According to Plaintiff, however, the Village Defendants refused to provide a statement that the case is pending, thus preventing her eviction action from being resolved.  Id.

Many of Plaintiff's factual allegations, in her view, describe circumstances showing the existence of a conspiracy by various Defendants to deprive her of property, namely the Front Street building, without due process of law.  She asserts that the Village Defendants have acted "to assist friends of the board and/or mayor, and to retaliate because she has been providing documentation and information to various authorities regarding ongoing collusion, abuses of power, [and] inappropriate handling of village monies . . . ." Id. at 11.  The Complaint details Plaintiff's efforts to report her concerns about treatment by Village officials to authorities which include the New York State Commission of Judicial Conduct, State Police, and Essex County District Attorney. With respect to the Front Street property, Plaintiff broadly alleges that it was the intent of the Loremans and Village Defendants to perpetrate what amounts to a "fraud" on her.  Id.  She contends that the Village was instructed by the State to better utilize the Loan Fund and to re-build the Village's coffers, as the Loan Fund had previously been under-used and employed to extend funds to a "close personal friend" of Defendant Whitney and Justice Head, which had never been repaid. Id. at 12-13.  After the loan for the Front Street property was made to Plaintiff  in the amount of $145,000, Plaintiff alleges that she was "repeatedly delayed and harassed by Village officials,"

causing significant costs to be incurred. Id. at 13. Then, following Plaintiff's invoicing of the Village for the cost overruns attributed to the it, and after Plaintiff had begun payment on the loan, "the Village admitted its egregious bad acts and offered Plaintiff a moratorium on payments as a means to offset" those costs. Id. Plaintiff alleges, however, that upon the end of the moratorium, Defendant Whitney manipulated "the amortization and interest, so as to increase the debt by more than $28,000." Id. at 14.

Further, she alleges that Whitney "misappropriated payments Plaintiff made on the account, and . . . told numerous people in the community and elsewhere that Plaintiff had 'never even made one payment on the loan.'" Id. For example, the Complaint details that a July 2004 payment was never credited to her account, that another mortgage payment was directed to water and sewage without notice to Plaintiff, even though she had been paying that bill separately, and that, upon repeated inquiry with the Village, Plaintiff was told that "mayor Whitney had instructed the clerks to apply Plaintiff's previous mortgage payment to other than her mortgage account." Id. With regard to the September 2004 mortgage payment, Plaintiff went to Village attorney's office on September 10th to attempt to make that month's payment; however, the attorney refused to discuss the matter or accept a check, though his secretary stated that "he would not accept the payment because Mark Whitney had just telephoned him, advising that the payment was late and that he was instructed to initiate foreclosure proceedings." Id. at 15. According to Plaintiff, September 10th was the last day of the month on which payment would have been timely, and thus she was prevented from making proper payments and forced into foreclosure.

In light of these events, Plaintiff alleges that Defendant Whitney and the Village "abused" her to "help their friends as well as make themselves look better to State auditors . . . . Whereas

8

initially they created the default to assist the Loremans, as Carolyn Loreman openly admitted, they got a bonus: inflate a payoff, foreclose, and . . . collect." Id. at 15-16.  Plaintiff notes, "as further evidence of the collusion and fraudulent intent of the [Village] and Loremans, as well as intent to deprive," the Village informed Plaintiff's counsel that it "intended not only to foreclose but to immediately ask the judge in that action, to appoint the Loremans as trustees and receiver of the building as soon as possible." Id. at 16 (emphasis omitted).  In April of 2004, according to Plaintiff, she met with Defendant Whitney in regard to her concerns, and he "not only admitted the bad faith, [but] insisted, 'We have insurance for this.  Sue us if you need to.'" Id. at 46.

Upon recommendation by her counsel, Plaintiff objected to the eviction proceedings and the demand that the Loremans be named trustees, and she filed a Complaint with the New York State Attorney General's Office, which, due to Justice Head's alleged involvement, advised Plaintiff to file a complaint with the New York State Commission on Judicial Conduct.  She did so on approximately June 8, 2005.  However, rather than lead to any reduction in Plaintiff's problems with the Village, she alleges that once her reporting efforts were discovered, "Justice Head and others increased their efforts and schemes . . . includ[ing] stalking, issuing bogus restraining orders, threats, slander, prowling, abuse of property, and more." Id. at 17.  Plaintiff alleges that Justice Head was witnessed directly engaging in these activities.  Id.

Another escalation of "abuse and harassment" is alleged to have occurred during the period between 2005 and 2007, when and after Plaintiff cooperated with investigations by the State Attorney General's Office and the New York Times of "abuses perpetrated in the small town and village courts" in the State. Id. at 42.  On December 14 and 15, 2006, the New York Times published a story and follow-up about the conduct of Justice Head. Id.  Plaintiff alleges that

Defendant O'Connor, as the former Code Officer and Village court bailiff, committed various abuses prior to the publication, including citing Plaintiff for "phony code violations" and calling Plaintiff at home and variously threatening her.  Plaintiff further alleges that, at some point later, "Defendant O'Connor saw Plaintiff in a local store and told her that she had been 'set up,' and that he no longer was working for the village as code officer."  Id. at 43.  Rather, according to Plaintiff, O'Connor admitted that he had been "instructed to harass Plaintiff for the purposes of discouraging her and causing her to quit."  Id.  It is claimed that O'Connor recounted a conversation in which Defendant Whitney told him: "I want that building bad, but I'll get it myself . . . you're putting us in danger of a lawsuit."  Id.

**b.  The Smiths**

On October 1, 2004, Plaintiff placed the Front Street premises up for sale.  She asserts that it had more than doubled in value in the past year due to her renovations, such that the building and business were eventually listed for $399,000 and generated inquiries from across the United States as well as from Canada.  Id. at 18.  Plaintiff alleges that when the Loremans and Village learned about the possibility of a sale, they became extremely concerned.  At the same time, according to Plaintiff, the Loremans began talking with the Smith Defendants about a potential purchase of the Launderette by the Smiths.  In November 2004, however, Plaintiff alleges that the Smiths learned she had filed to evict the Loremans, and Defendant Kathryn Smith then approached Plaintiff to discuss forming a partnership directly with her.  Id.  Subsequently, Plaintiff explained to Kathryn Smith her assorted problems with the Loremans and Village.  Smith then helped serve witness subpoenas for the eviction trial and repeatedly urged Plaintiff to enter a partnership with her.  Id. at 19.  On December 21, 2004, using a form downloaded from a website, Plaintiff states that she and

10

Kathryn entered into such a partnership agreement.

In April 2005, Kathryn Smith approached Plaintiff about refinancing the Front Street property rather than renewing its sale listing.  An agreement was reached to this end, with a memorandum of understanding outlining various terms and contingencies.  In part, this agreement provided that title of the property would temporarily pass to the Smiths in exchange for their financing the mortgage, pending resolution of the problems with the continuing non-paying tenancy of Loremans and with the Village; thereafter, Plaintiff would be allowed to buy out the Smiths or be added to the title.  Id.  Additionally, the Smiths agreed to evict the Loremans by any practical means, after which they would jointly open a commercial enterprise with Plaintiff while Plaintiff would operate the Front Street property as a bed and breakfast establishment.  Id. at 20.  On September 6, 2005, Plaintiff alleges that title was passed consistent with, and subject to, the parties' agreement.  Other financing in the form of a note for $36,000 is alleged to be held by Plaintiff , wherein that amount would be credited to Plaintiff's equity and partnership interests if the agreement's terms were met.  Id.

The Smiths soon ran afoul of Plaintiff by allegedly defaulting on the agreement and refusing to make payment on the note, despite Plaintiff's demands.  Id. at 21.  Further, the Smiths are alleged to have been "secretly meeting" with the Loremans, "both before and after the September 2005 closing."  Id.  Plaintiff alleges that the Smith Defendants admitted that they met with the Loremans to discuss "business options," and that, in fact, "[w]hile going through the motions to evict the Loremans . . . they followed through with meetings and plans with the Loremans to defraud and deprive Plaintiff of not only justice or equity, but the building, her business and assets as well."  Id.  After October 31, 2005, when Kathryn Smith failed to appear at a meeting with Plaintiff, the Smiths

11

are alleged to have postponed every meeting scheduled between the parties.  Plaintiff asserts that she attempted to pay half of the mortgage and paid other bills related to the Front Street building during this time.  Then, on or about December 8, 2005, the Smiths are alleged to have locked Plaintiff out of the premises and, subsequently, told the New York State Police that the building was "their house."  Once this occurred, Plaintiff states that she could no longer operate or develop her business, and that she communicated the situation to "the DA's office, the AG, and the lead FBI agent who had been contacting her."  Id. at 23.   Meanwhile, it is alleged that the Smiths and Loremans continued to jointly use the Front Street premises, retaining an estimated $80,000 of Plaintiff's personal property in the premises which have never been recovered.

The Complaint generally describes an abrupt transformation in Plaintiff's apparent relationship with the Smiths.  On September 11, 2005, Plaintiff recounts that Kathryn Smith signed a notarized statement attesting to the "dire and extreme tactics" and "injustice and discovery of extreme corruption" in connection with reporting the problems experienced with the Loremans and Village officials; yet, according to Plaintiff, Kathryn Smith perjured herself when, a few months later, the Smiths denied the existence of dire circumstances in depositions made during Plaintiff's Chapter 13 bankruptcy proceedings, as a fraudulent conveyance action was brought against the Smiths pursuant to the bankruptcy case.  Id. at 24. Ken Smith is likewise alleged to have perjured himself in depositions stating that he and his wife had no understandings and agreements with the Plaintiffs.  Id. at 26.

After the fraudulent conveyance action was initiated, it is alleged that Plaintiff suffered an "onslaught of harassment" against herself and her family, including her deck being set afire.  Id. at 25.  The Smiths and Loremans are alleged to have met repeatedly to plan their efforts against

12

Plaintiff, with both Defendant groups using the same lawyer.  The Village is alleged to have offered to cease any foreclosure action and restructure the loan if Plaintiff would consent to adding the Smith to the existing loan.  As a result of the Chapter 13 proceedings, the Bankruptcy Judge is alleged to have ordered the Smiths to allow Plaintiff to survey and take inventory of the premises. On the date this inspection occurred, the Smiths elected to move out of the premises and return to their home.  Later, on or about December 30, 2006, the Smiths are alleged to have contacted Plaintiff through their attorney to inquire if she would take back ownership of the Front Street building.  Plaintiff responded that she would do so only upon the Smiths' payment of the current mortgage and compensated certain losses.  Then, on January 21, 2007, a foreclosure action was initiated against the Smiths by Defendant Bayview Loan Servicing.

**c. Bayview**

Plaintiff's allegations against Bayview are limited in scope, revolving around the company's foreclosure on the Front Street property.  According to the Complaint, the Smiths executed a mortgage on the property which, at the time of Plaintiff's filing, was held by Bayview and was for an amount much less than the property's value.  In August 2007, Plaintiff asserts that the Smiths attempted to deed the Front Street building back to Bayview rather than face foreclosure; upon inquiries by Plaintiff about her interest in the property, Bayview is alleged to have been non-responsive.  On approximately September 1, 2007, Plaintiff recounts that she learned Bayview and/or the Smiths listed the property for sale.  Then, "after many telephone conversations with representatives for BLS, including attorneys and financial officers . . . BLS claimed to be willing to work with Plaintiff to at least retrieve her assets if not arrange a suitable resolution of the Note."  Id. In November 2007, Bayview proceeded to take the deed for the property from the Smiths in lieu of

13

foreclosing; this transaction occurred without payment to Plaintiff on her $36,000 note. Id. at 28.

Additionally, Plaintiff alleges that she has been prevented from retrieving her personal property

located within the premises by Bayview. Id. According to Plaintiff, the property may be in the

process of being sold or has already been sold to an unnamed party. Id.

### d. Standard Federal Bank

Standard is a party to this action as the successor by merger to ABN AMRO Mortgage

Group, the entity which has held the mortgage on a home belonging to Plaintiff's former husband.

This property is entirely separate and discrete from the Front Street building previously discussed.

The note between ABN AMRO and Plaintiff's former husband pertaining to the home was signed

and dated on March 21, 2001. Id. at 29. According to Plaintiff, under the terms of her divorce,

Plaintiff was to pay the mortgage owing to ABN AMRO and the ex-husband was to execute a

warranty deed for title to the home. A number of problems subsequently arose, however, leading to

conflict with ABN AMRO. Generally, Plaintiff alleges "a pattern of abuses and negligence going at

least as far back as January of 2003" by ABN AMRO, which "include[d] deceptive practices as well

as joining in with other defendants named in the scheme to defraud, and to unjustly deprive Plaintiff

of liberty and property." Id. at 28-29.

Plaintiff asserts that in late 2002 and early 2003, her ex-husband accessed Plaintiff's account

from which mortgage payments were made and withdrew funds without her knowledge; as a result,

"at least one" of Plaintiff's payments to ABN AMRO was returned. Id. at 29. Plaintiff alleges that

repeated attempts to discuss the situation with ABN AMRO were rebuffed by customer service

representatives on the ground that she was "not the mortgagor," despite the alleged existence of a

record held by the company authorizing such communications about the account. Id. In relation to

these allegations, the Complaint references the Real Estate Settlement Practices Act of 1974

prohibition of "discrimination based on 'family status.'"  Id. at 30.  Plaintiff asserts that she "by quit

claim deed and by her execution of the Divorce documents did execute her agreement to assume and

pay the mortgage debt, and thus became the 'substitute mortgagor.'"  Id.  Nevertheless, ABN

AMRO "continued to return payments sent in on account by Plaintiff," even though "Plaintiff sent

these documents, along with numerous letters and requests for assistance" to the company.  Id.

Eventually, Plaintiff's efforts led to contact with a Pat Tillery at ABN AMRO, who sent a letter to

Plaintiff on or about June 5, 2003 asking for information concerning assumption of the mortgage by

Plaintiff.  On June 27, 2003, Plaintiff contends that ABN AMRO sent a notice stating that it had

received a mortgage payment she had sent, though Plaintiff claims that the company later denied

that the payment was accepted or retained.  Id. at 31.

       In September 2003, Plaintiff received a forbearance agreement document from the company,

rather than the assumption of mortgage document she had anticipated.  Id.  Plaintiff alleges that

ABN AMRO sought from Plaintiff proof of insurance, which Plaintiff provided; yet ABN AMRO

added high-premium insurance fees to the mortgage for which Plaintiff was indirectly charged.

Once this insurance issue emerged, Plaintiff asserts that ABN AMRO promised a credit to Plaintiff

for the excess amount, equal to at least $5,000.  Id. at 32.  The Complaint indicates that the credit

was never extended, however, and that ABN AMRO meanwhile was pursuing foreclosure

proceedings.  Id. at 32-33.  Plaintiff alleges a frustrating series of interactions with the company

throughout 2004 and 2005.  In August 2005, prior to a scheduled sheriff's sale of the home, Plaintiff

asserts that was offered a payment agreement by a Andrea Roberson of ABN AMRO, though

"[c]ounsel for ABN has steadfastly denied same, however their transaction history indicates this is

true." Id. at 33-34.  Negotiations did not progress because "Plaintiff was told that if she still wanted

to assume the mortgage, she would have to pay approximately $38,000, which included the

insurance overcharges and over $12,000 in attorney's fees[.]" Id. at 34.  Faced with a March 2006

forced sale date, Plaintiff filed for bankruptcy protection.  Id. at 36.  Proceedings were  "short lived,

and . . . Defendant ABN AMRO it turns out did not apply the more than $5,000 in funds owed to

Plaintiff or the $6,400 plus in funds Plaintiff had paid under the short payment agreement . . . .

ABN AMRO actually sent the receipt for those payments to Plaintiff's ex husband[,]" which

"deprive[d] Plaintiff of a payment and credit history desperately needed . . . ." Id.

The home was then sold through foreclosure in January 2007.  Another episode of

negotiations between Plaintiff and ABN AMRO soon followed, during which the parties are alleged

to have agreed that Plaintiff could repurchase the home.  The Complaint describes a dispute in

which AMRO is alleged to have cashed both Plaintiff's initial deposit check and superceding

deposit check.  Id. at 37.  At the end of April 2007, the repurchase agreement expired without a

transfer of the home from AMRO to Plaintiff.  Id. at 38.  The Complaint discusses further problems

with ABN AMRO that emerged that May concerning communications pushing back deadlines set

by ABN AMRO for resolving the repurchase situation.  Id. at 39.  Meanwhile, Plaintiff obtained a

stay of eviction on April 28, 2007. On September 11, 2007, ABN AMRO is alleged to have sought

civil eviction of Plaintiff by a sheriff, resulting in a 72 hour notice to Plaintiff issued on September

13, 2007.  Plaintiff alleges that she unsuccessfully sought an order of contempt against ABN

AMRO.  Id.  She now claims to have been subjected to "a pattern of negligent and deceitful

practices which, at its most basic level, is an assault on civil rights and egregiously in contrast to the

Fair Debt Collection Practices Act." Id. at 40.

16

## III.   DISCUSSION

### a.  Standard of Review

Plaintiff casts a wide net of allegations against the Defendants, and her Complaint tends not to channel those factual allegations into the clearest articulation of her specific claims.  That the Complaint was generated without the aid of an attorney, and that Plaintiff's narrative style expresses a number of disparate elements, does not in itself, however, entitle the Defendants to dismissal of Plaintiff's action.  This Court affords *pro se* litigants special solicitude and is duty-bound to read the Plaintiff's Complaint broadly.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990).  *Pro se* pleadings "must be read liberally and should be interpreted to raise the strongest arguments that they suggest."  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)); Hemphill v. New York, 380 F.3d 680, 687 (2d Cir. 2004) (stating that "[i]t is well-established that when a plaintiff proceeds *pro se* . . . a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations") (citations and quotations omitted).   As a *pro se* litigant, Plaintiff's Complaint is subject to "less stringent standards than formal pleadings drafted by lawyers."  Hughes v. Rowe, 449 U.S. 5, 9 (1980) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)).  Nevertheless, a litigant's "*pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law."  Id. (citation omitted).

Federal Rule of Civil Procedure 8(a) requires that a complaint "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief; and . . . a demand for the relief sought."  FED. R. CIV. P. 8(a)(2)–(3).  In order to withstand a motion to dismiss under Rule 12(b)(6),

"a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A party must plead with sufficient factual detail to "'nudge[] [his or her] claims . . . across the line from conceivable to plausible.'"  Iqbal, 129 S. Ct. at 1950–51 (quoting Twombly, 550 U.S. at 570)).  While stating a claim does not require the recitation of detailed factual allegations, it does require facts sufficient to state a claim for relief that is *prima facie* plausible.  Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 555).

The Court must accept the allegations in a well-pleaded complaint as true, Albright v. Oliver, 510 U.S. 266, 268 (1994), and draw all inferences in favor of the non-moving party. Scheuer v. Rhodes, 416 U.S. 232, 236 (1973); see also Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir. 2006); King v. Am. Airlines, Inc., 284 F.3d 352, 356 (2d Cir. 2002).  A complaint should be dismissed on a Rule 12(b)(6) motion only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim.  See Twombly, 550 U.S. 544 (2007).  However, "conclusory allegations are insufficient to withstand a motion to dismiss." Giaccio v. City of New York, No. 04 Civ. 3652, 2005 WL 95733, at *5 (S.D.N.Y. Jan. 19, 2005); see also Straker v. Metro. Transit Auth., 333 F. Supp. 2d 91, 102 (E.D.N.Y. 2004).

**B. Claims Against the Village Defendants**

As against the Village Defendants, consisting of Mark J. Whitney, William O'Connor, William Seaver, and the Village of Keeseville, Plaintiff asserts claims for breach of contract, breach of implied-in-fact contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, intentional infliction of emotional distress, fraud, and violations of, or conspiracy to

violate, the Due Process and Equal Protection Clauses of the 14th Amendment.  The Village

Defendants move to dismiss the Complaint for failure to comply with the pleading standard of

Federal Rules of Civil Procedure 8(a)(2) and 9(b), and to otherwise dismiss all claims therein,

arguing primarily on the basis of Federal Rule of Civil Procedure 12(b)(6) that Plaintiff's allegations

fail to state a claim to relief.

> *i. Federal Rule of Civil Procedure 8(a)(2)*

Having fully reviewed Plaintiff's Complaint, the Court rejects the Village Defendants'

categorical argument to strike the instant Complaint on the basis of Rule 8(a)(2).  Given the

Plaintiff's *pro se* status and, therefore, the liberal reading the Court affords to her pleadings, the

Village Defendants' assertions of "utter confusion" are not persuasive; the Plaintiff sets forth

specific factual allegations as to the Defendant parties and, in her conclusion, asserts legal claims

based upon those alleged facts, thus providing notice to the Defendants of the conduct and events

which Plaintiff believes amount to various claims for relief.  Memo. of Law at 2, Dkt. No. 164.  It is

certainly true that Plaintiff's pleadings vary in quality with respect to her different claims, and the

Complaint contains some allegations with less relevance to the claims they purport to support than

other allegations.  It is, of course, a separate and subsequent inquiry whether particular claims are

defective and subject to dismissal under Rule 12(b)(6).  Accordingly, the Complaint survives the

Village Defendants' Rule 8 challenge.

> *ii.  Fraud - Federal Rule of Civil Procedure 9(b)*

The Village Defendants are correct, however, that Plaintiff fails to plead fraud with the

particularity required by Federal Rule of Civil Procedure 9(b).  FED. R. CIV. P. 9(b) ("In alleging

fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged

generally.").  Unlike the other aforementioned claims expressly titled and alleged by Plaintiff, the

Complaint does not include a direct assertion of fraud against any Defendant.  Rather, interspersed

through the pleadings' factual allegations are accusations of fraudulent conduct or the defrauding of

Plaintiff by the Defendants.  "To make out a prima facie case of fraud, the complaint must contain

allegations of a representation of material fact, falsity, scienter, reliance and injury."  Small v.

Lorillard Tobacco Co., 94 N.Y.2d 43, 57 (N.Y. 1999); see Wynn v. AC Rochester, 273 F.3d 153,

156 (2d Cir. 2001).   A "complaint must identify the statements plaintiff asserts were fraudulent and

why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they

were made."  Hollin v. Scholastic Corp., 252 F.3d 63, 70 (2d Cir. 2001).  Plaintiff does not

articulate the elements of a fraud claim in such a way as to meet this pleading threshold, and indeed

it is far from clear that Plaintiff actually seeks to assert such a claim.  A fair reading of the

Complaint suggests that the conduct which is labeled as fraudulent in Plaintiff's factual allegations

may actually be directed towards establishing certain other claims specifically asserted in the

conclusion of her Complaint.  The Plaintiff's fraud, or fraudulent inducement, claim, to the extent

that such a claim is alleged against the Village Defendants, is dismissed.

*iii. Individual Capacity Claims Against Defendants Whitney, O'Connor, and Seaver*

The Village Defendants contend that, as to the persons named within the Village Defendant

group, Plaintiff fails to "allege both a violation of her civil rights in the course of defendant's

performance of his duties, and defendant's personal involvement in such violation, against any of

these defendants."  Memo. of Law at 5, Dkt. No. 164.  They argue that the allegations made against

the Defendants "are vague and unspecific and all causes of action against these defendants in their

20

individual capacities should be dismissed." Id.

"Where damages are sought in a section 1983 action, the defendant must be responsible for the alleged constitutional deprivation." Id. at 1065.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) (quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)).  Whether or not there was "personal involvement is a question of fact." Williams, 781 F.2d at 323.  Here, taking the allegations in the Complaint as true, Albright, 510 U.S. at 268, Plaintiff's extensive factual allegations about the Village Defendants' actions,  their individual capacities, concerning her and the Front Street property do demonstrate "personal involvement" and, therefore, a viable claim under 42 U.S.C. § 1983.  For this reason, Plaintiff is "entitled to offer evidence to support [his] claims."  Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001).  The Court shall not dismiss the claims against the Village Defendants on the basis of a failure to plead personal involvement.

### iv. Justice Head

The Village Defendants assert that "all causes of action predicated on the actions of Village Justice Head are barred and must be dismissed."  Memo. of Law at 5, Dkt. No. 164 (emphasis and capitalization omitted).  Justice Head, now deceased, was already dismissed from this action by the Court, and Plaintiff's current Complaint does not seek to reassert claims against Justice Head. Rather, Plaintiff makes factual allegations concerning conduct by the Justice performed in his judicial capacity as well wrongful conduct done outside that role   The Defendants' argument is entirely misplaced.  First, the Complaint does not assert any claims which rest exclusively on allegations concerning Justice Head.  Second, while judicial immunity operates to bar suits directly

against the Justice for his judicial acts, Tulloch v. Coughlin, 50 F.3d 114, 116 (2d Cir. 1995),

judicial immunity is no bar to establishing a civil rights claim against the Village Defendants or

other Defendants in which the Justice's conduct may be involved; this is true both with respect to a

claim alleging a conspiracy under § 1983 or a claim seeking municipal liability.  Here, the Village

Defendants fail to explain why dismissal of claims should follow from Plaintiff's inclusion of

factual allegation concerning Justice Head, and fail to even specify what claims should be

dismissed.  Accordingly, the Court shall dismiss no claims on this argued basis.

 *v.  42 U.S.C. § 1983 Claims*

  The Village Defendants argue that the Complaint does not contain allegations sufficient to

state a cause of action under § 1983.  To properly plead a § 1983 claim, "a plaintiff must allege that

(1) the challenged conduct was attributable at least in part to a person who was acting under color of

state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of

the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).  If a plaintiff

advances a claim seeking municipal liability, under Monell v. New York City Dep't of Social

Services, 436 U.S. 658, 694 (1978), the plaintiff must plead that a municipal policy or custom

directly caused the complained-of constitutional injury; a theory of respondeat superior or vicarious

liability cannot give rise to municipal liability under § 1983.  Canton v. Harris, 489 U.S. 378, 385

(1989); see also Collins v. City of Harker Heights, 503 U.S. 115, 120-121 (1992).  As Defendants

acknowledge, a custom or policy may be shown by a final policymaker committing or commanding

the complained-of constitutional violation.  Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000).

"Where the contention is not that the actions complained of were taken pursuant to a local policy

that was formally adopted or ratified but rather that they were taken or caused by an official whose

actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." Id.  The existence of such authority presents a legal question which turns on state law.  Id. (citing, *inter alia*, Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989) and McMillian v Monroe County, 520 U.S. 781, 786 (1997)).

Defendants contend that Plaintiff has failed to sufficiently allege a custom or policy which caused her alleged constitutional injury.  To make this argument, they select only a few of her allegations, which indeed do not tend to show the existence of such a custom or policy, and then conclude that Plaintiff's claims against the Village must be dismissed.  This is simply not the case, given the standard of review for Defendants' 12(b)(6) Motion and in view of Plaintiff's *pro se* status.  Both under the custom/policy and final policymaking authority branches of municipal liability, the Complaint creates issue of fact which bar dismissal at this juncture.

Plaintiff depicts the systematic and protracted actions of various Village official working in concert to potentially deprive her of property without due process.  Further, Defendant Whitney, the Mayor of the Village for a period relevant to this litigation, is alleged to have ordered a number of village employees to acts in ways that would advance such an outcome.  The facts alleged by Plaintiff are far from being a mere assertion or conclusory statement, as the Complaint is replete with "allegations of fact tending to support, at least circumstantially, such an inference." Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993).  Accordingly, Defendants' Motion to dismiss all claims against the municipality is denied.

The Village Defendants' contention that Plaintiff fails to plead a cognizable constitutional injury as to the individually named Defendants must similarly be rejected.  The § 1983 claim

advanced by Plaintiff seeks damages for deprivation of property without due process.  To prevail on

such a claim, a plaintiff must first identify a legally protected property interest which was subject to

deprivation and then show that the plaintiff received constitutionally inadequate process in the

course of the deprivation.  O'Connor v. Pierson, 426 F.3d 187, 196 (2d Cir. 2005).  According to

Defendants, "Plaintiff simply makes the bare assertion that her due process rights were violated . . .

." and that while "[P]laintiff claims that she suffered a loss of business and reputation, she does not

actually plead that she had a legally protected property or liberty interest . . . [or] that she was

deprived of any governmental procedure or notice, nor that she suffered harm as a result of any such

deprivation."  Memo. of Law at 9, Dkt. No. 164.  This argument directly contradicts the factual

allegations contained in Plaintiff's Complaint. It is true that Plaintiff does not give a precise

articulation of a particular procedure or notice that she should have received; however, the

Complaint readily identifies the Front Street premises as a protected property at issue and details

extensive acts by the Village Defendants, including manipulation of successive eviction procedures

and various steps taken to induce foreclosure and loss of the property, which may be found to

violate Plaintiff's due process rights.  Taking all of Plaintiff's allegations as true, and in view of

Plaintiff's *pro se* status, the pleadings before the Court may well support a successful procedural

due process claim under § 1983.  The Defendants' Motion to dismiss Plaintiff's due process claim is

denied.

Plaintiff also pleads a substantive due process claim pursuant to § 1983, which Defendants

seek to dismiss.  "Government action might be so arbitrary that it violates substantive due process

'regardless of the fairness of the procedures used."  Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir.

1995) (citation and quotation omitted).  Again, the Front Street property is the "constitutionally

cognizable property interest at stake" that Defendants' alleged actions interfered with or deprived her of in a manner violative of substantive due process protections.  Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995).  "To establish a substantive due process violation, the [plaintiff] must show that the [defendant's] alleged acts against their land were arbitrary, conscience-shocking, or oppressive in the constitutional sense, not merely incorrect or ill-advised." Ferran v. Town of Nassau, 471 F.3d 363, 369-370 (2d Cir. 2006) (citation and quotations omitted); see also Zahra v. Town of Southold, 48 F.3d 674, 680-682 (2d Cir. 1995) (discussing the Second Circuit's treatment of substantive due process claims based on land use issues).

Rendering all inferences in favor of Plaintiff and assuming her factual allegations to be true, the Court cannot conclude, at this time, that her substantive due process rights have not been violated.  Should Plaintiff establish all of her allegations concerning the Village Defendants' extensive actions taken against her possession, operation and ownership of the Front Street property, a viable substantive due process claim may well exist.  Defendants cite to no topically relevant case law, referencing only examples of "a teacher slapping a student" and "the forced pumping of a suspect's stomach."  Rather, they rest their Motion for dismissal on the notion that "[e]ven given the sheer volume of these and similar allegations contained in plaintiff's Complaint, not a single one approaches the threshold showing to satisfy the requirements of a substantive due process violation."  Memo. of Law at 10, Dkt. No. 164.   No support is provided for the proposition that each action by a Village Defendant must be considered in isolation or that the aggregate actions by the Village or its officials cannot together constitute a substantive due process violation. Accordingly, Defendants' Motion on this issue is denied.

Language in the Plaintiff's statement of her civil rights claims mentions "equal protection."

Compl. at 50.  To the extent that Plaintiff seeks to bring a claim for violation of the Equal Protection Clause of the Fourteenth Amendment, Defendants' Motion to dismiss that claim is granted.  The Equal Protection Clause "protects against class- or group-based invidious discrimination" and "prohibits arbitrary and irrational discrimination even if no suspect class or fundamental right is implicated."  Muller v. Costello, 187 F.3d 298, 309 (2d Cir. 1999) (citations omitted).  Plaintiff does not allege membership in a protected class of differential treatment based on discriminatory animus.  Accordingly, she has not pleaded the elements of a equal protection claim, and Defendants' Motion on this issue is granted.

Plaintiff asserts a § 1983 conspiracy claim against the Village Defendants and a number of private Defendants for conspiring to deprive her of the Front Street property in violation of procedural and substantive due process rights.  To state such a claim, a plaintiff must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Ciambriello v. County of Nassau, 292 F.3d 307, 324-325 (2d Cir. 2002).  To state the claim against a private entity, a plaintiff "must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act," or, in other words, that "the private actor is a willful participant in joint activity with the State or its agents."  Id. at 324.  "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."  Id. (citing Dwares, 985 F.2d at 100).

Plaintiff's conspiracy claim is sufficiently articulated to survive the Village Defendants'

Motion to dismiss, particularly as the Court reads the pleadings in light of her *pro se* status.  The

Complaint alleges the requisite elements in a non-conclusory manner as against the Village; while

her conspiracy claim as against certain other Defendants is deficient, Plaintiff describes facts

indicating the Village Defendants and the Loremans may have engaged in an agreement to harm her

ownership of the Front Street property and that they took a series of steps towards that end.  In their

Motion, the Village Defendants wholly ignore the content of Plaintiff's pleadings, instead reciting

the standard for pleading a conspiracy claim and summarily concluding, without discussion, that

Plaintiff did not meet it.  Plaintiff's Complaint does not present the case where a litigant advances a

§ 1983 conspiracy claim devoid of allegations matching the necessary elements, and she is "entitled

to offer evidence to support [her] claims."  Todd, 275 F.3d at 198.  Defendants' Motion is denied on

this issue.

   vi.  *Breach of Contract and Implied Covenant of Good Faith and Fair Dealing*

   Plaintiff asserts claims against the Village Defendants for breach of contract, breach of

implied-in-fact contract, and breach of an implied covenant of good faith and fair dealing.

Defendants move to dismiss these claims based on, *inter alia*, insufficient pleading of their requisite

elements.  Upon review of the Complaint, the Court finds that the contract claims are indeed

inadequately pleaded and subject to dismissal.

   "To state a claim for breach of contract under New York law, a plaintiff must allege: (1) a

contract; (2) performance of the contract by one party; (3) breach of the contract by the other; and

(4) damages."  Universal Marine Med. Supply, Inc. v. Lovecchio, 8 F. Supp. 2d 214, 221 (E.D.N.Y.

1998).  "A contract implied in fact may result as an inference from the facts and circumstances of

the case, although not formally stated in words, and is derived from the presumed intention of the

parties as indicated by their conduct." Jemzura v. Jemzura, 36 N.Y.2d 496, 504 (N.Y. 1975)

(citations omitted).  An implied contract "is just as binding as an express contract arising from

declared intention, since in the law there is no distinction between agreements made by words and

those made by conduct." Id.  However, a "contract cannot be implied in fact where the facts are

inconsistent with its existence . . . or where there is an express contract covering the subject-matter

involved." Ludemann Elec., Inc. v. Dickran, 2010 NY Slip Op. 5520, at *2 (2d Dep't 2010)

(quoting Miller v. Schloss, 218 N.Y. 400, 407 (N.Y. 1916)).

      The instant contract claims arise from the loan agreements Plaintiff entered into with the

Village in order to finance and develop the Front Street property; presumably, these loan agreements

are the contracts underlying Plaintiff's claim.  With respect to the implied-in-fact contract claim,

Plaintiff generally refers to "promises" made by Defendants.  Compl. at 48.  Among her allegations,

Plaintiff has alleged that the Village Defendants refused to accept payment on her loans and took

various steps to delay and prevent her from being able to effectuate the purpose of her purchase of

the Front Street property.  While Plaintiff certainly alleges troubling conduct by the Village

Defendants in connection with the loan agreements, Plaintiff does not adequately plead the specific

elements of a breach of contract claim, either express or implied, to survive the Village Defendants'

Motion to dismiss.  The Complaint does not assert the existence of any terms within a contract that

have been breached, nor does it allege her own performance and the particular nature of Defendants'

breach.  As such, regardless of Plaintiff's alleged difficulties with the Village, a viable claim is not

pleaded before this Court.  The failure to identify how the Defendants' actions amounted to a breach

of Plaintiff's loan agreement with the Village requires that the Court dismiss the contract claim.

      The implied-in-contract claim must be dismissed, as well.  First, Plaintiff does not state what

specific conduct her claim is referring to, or whether the conduct in question is the same as that which forms the basis of Plaintiff's breach of contract claim. Plaintiff's allegations are vague and general, failing to name the breached terms of an agreement between the parties, the existence of which is shown by surrounding facts and circumstances. Secondly, to the extent that the claim is predicated on express terms in the loan agreements, the claim is duplicative, whether or not the breach of express contract claim has been adequately plead. Therefore, Plaintiff's implied contract claim is dismissed.

Plaintiff also asserts a promissory estoppel claim, though the particular facts forming its basis are not stated. To state a promissory estoppel claim, a plaintiff must allege "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co., 804 F.2d 787 (2d Cir. 1986). Plaintiff, however, only alleges that "Defendants deliberately made promises to the Plaintiff when they expected that the Plaintiff would rely on those promises." While the Complaint contains factual allegations that may be consistent with a promissory estoppel claim, the lack of specification of a clear promise by a particular Defendant as well as the reasonable reliance and subsequent injury that flowed from it renders Plaintiff's claim insufficiently pleaded. Accordingly, it is dismissed.

It is established under New York law that "every contract contains an implied covenant of good faith and fair dealing. This covenant includes an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 230 (2d Cir. 1991) (citations and quotations omitted). "While a party can breach the covenant of

good faith and fair dealing without breaching any terms of the contract itself, it is axiomatic that an implied covenant must comport with the parties' intent and be consistent with the written provisions of the contract." Canpartners Invs. IV, LLC v. Alliance Gaming Corp., 981 F. Supp. 820, 824 (S.D.N.Y. Oct. 29, 1997) (citations omitted).

The Village Defendants devote only a single sentence to Plaintiff's good faith and fair dealing claim, simply contending that it is "duplicative of the breach of contract claim and should also be dismissed as such." Memo. of Law at 17, Dkt. No. 164. The Court is not persuaded by this conclusory statement; the Complaint contains multiple allegations of intentional conduct by the Defendants done to inhibit Plaintiff from carrying out her obligations under the loan agreement, and these allegations cannot be dismissed with such a summary treatment. Given Plaintiff's *pro se* status and the liberality thus afforded to her pleadings, the Court finds that Plaintiff has sufficiently alleged a claim for breach of an implied covenant of good faith and fair dealing as against the Village, so as to "entitle[ her] to offer evidence to support [her] claims." Todd, 275 F.3d at 198.

*vii. Intentional Infliction of Emotional Distress*

Plaintiff brings a claim for intentional infliction of emotional distress. The tort requires "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996) (citing Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993)). The first element refers to "conduct [that] has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303 (1983). In New York, a claim based on intentional infliction of emotional harm, as

an intentional tort, is subject to a one-year statute of limitations.  See <u>Dana v. Oak Park Marina</u>, 230

A.D.2d 204, 210 (4th Dep't 1997); N.Y. CPLR 215.

 The Village Defendants move to dismiss the claim as insufficiently pleaded; they argue

"Plaintiff merely alleges that she was harassed and intimidated.  She has made no showing that,

even if true, such conduct was sufficiently egregious as to meet the threshold for this cause

of action."  Memo. of Law at 18-19, Dkt. No. 164.   Nowhere do Defendants explain how this is the

case.  The Complaint's assertions of a pattern of concerted harassment and intimidation by the

Village Defendants "establish[] the existence of questions of fact as to whether [their] alleged

conduct exceeded the bounds of decency and as to whether the plaintiff suffered genuine and severe

distress as a result."  <u>Flatley v. Hartmann</u>, 138 A.D.2d 345, 346 (2d Dep't 1988).  Accordingly, the

Court will not dismiss Plaintiff's claim for failing to allege conduct that, as a matter of law, does not

rise to an extreme and outrageous level; however, the Court perceives that the one year statute of

limitations may operate to bar the claim, depending on the timing of the predicate events.  This issue

can be resolved at a subsequent stage of the litigation.

## C.  Claims Against the Loremans

 As against the Loreman Defendants, Plaintiff asserts claims for breach of contract, breach of

implied-in-fact contract, breach of implied covenant of good faith and fair dealing, promissory

estoppel, intentional infliction of emotional distress, fraud, and, pursuant to § 1983, conspiracy

violations of her Due Process and Equal Protection rights.  The Loremans move to dismiss all

claims under Rule 12(b)(6).  Much of the Court's evaluation of these claims will reflect the analysis

already undertaken with respect to the Village Defendants.

 As discussed above, Plaintiff's Complaint states claims against the Village Defendants,

pursuant to § 1983, for violations of, and conspiracy to violate, her due process rights.  The factual allegations underlying those claims, as the Court has related them, involve the significant participation of the Loremans in the allegedly wrongful conduct.  "To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act."  Spear v. West Hartford, 954 F.2d 63, 68 (2d Cir. 1992).  "'In final analysis the question is whether the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State.'"  Id. (quoting National Collegiate Athletic Association v. Tarkanian, 488 U.S. 179, 199 (1988)) (other citations omitted).  Whether a private actor has engaged in sufficient state action is measured by either the symbiotic relationship test or the close nexus test.  "While the symbiotic relationship test focuses on the state's overall relationship with the private actor, the close nexus test specifically examines the state's link to the challenged action."  Hadges v. Yonkers Racing Corp., 918 F.2d 1079, 1082 (2d Cir. 1990).  "The prototypical symbiotic relationship case occurs when the government has a proprietary interest in the private entity."  Scheiner v. Wallace, 860 F. Supp. 991, 999 (S.D.N.Y. Aug. 18, 1994).  The close nexus test may be satisfied where: " it can be said that the State is responsible for the specific conduct of which the plaintiff complains;" "the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government];" or "the private entity has exercised powers that are traditionally the exclusive prerogative of the State."  Id. (citing Blum v. Yarentsky, 457 U.S. 991, 1004 (1982); San Fransisco Art & Athletics, Inc. v. Untied States Olympic Committee, 483 U.S. 522, 546 (1987) (quotations omitted)).

Assuming Plaintiff's allegations to be true and drawing all inferences in her favor, the Court

has no doubt that Plaintiff's § 1983 claim against the Loremans should survive their Motion to dismiss.  The Complaint indicates that the Village Defendants and the Loremans acted together, engaging in joint conduct, which included use of the Village Court and Village administrative offices, to deprive her of the Front Street property.  According to Plaintiff, the Village had a proprietary interest in the Front Street property by way of their loan agreements, and both the Loremans and the Village worked in concert to induce Plaintiff's default and return the property to the possession of the Loremans.  Therefore, the § 1983 conspiracy due process claims against the Loremans remain part of this action.  For the reasons discussed above, however, Plaintiff's § 1983 Equal Protection claim is dismissed as against the Loremans for failing to state a claim.  The three year statute of limitations in New York for a § 1983 claim does not warrant dismissal of Plaintiff's claims, but may restrict the basis on which the claims are predicated; issues of fact are present as to the existence of the alleged conspiracy, its timing and the acts which allegedly carried it out.

The Court's analysis of Plaintiff's fraud claim as against the Village Defendants, if such a claim has in fact been brought, extends to the Loremans.  That is, Plaintiff does not allege the requisite elements of a fraud claim so as to meet the pleading threshold.  See Lorillard Tobacco Co., 94 N.Y.2d at 57.  Accordingly, any fraud claim against the Loremans is dismissed.  The Court, likewise, dismisses the breach of contract claims, both express and implied-in-fact, as against the Loremans for the reasons state above with respect to the Village Defendants.  The Complaint does not assert the existence of any terms within a contract that have been breached, nor does it allege her own performance and the particular nature of Defendants' breach.  Similarly, the promissory estoppel claim, as against the Loremans, is dismissed for failing to state a claim.  The Loreman Defendants do not discuss Plaintiff's claims for intentional infliction of emotional distress and for

33

breach of an implied covenant of good faith and fair dealing.  In the absence of any arguments against these claims, other then a reference to pleading standards generally, the Court will allow these claims to remain in this action, as discussed above with respect to the Village Defendants.

**D.  Claims Against the Smiths**

As against the Smith Defendants, Plaintiff asserts claims for breach of contract, breach of implied-in-fact contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, intentional infliction of emotional distress, fraud, and, pursuant to § 1983, conspiracy violations of her Due Process and Equal Protection rights.  The Smiths move to dismiss all claims, *inter alia*, on the basis that there is no viable § 1983 claim, and the Court should decline supplemental jurisdiction over the remainder of the claims, which sound under state law.

Plaintiff's factual allegations do not support a § 1983 conspiracy claim against the Smiths. These Defendants occupy a very different role than the Loremans in the narrative of events alleged by Plaintiff.  Regardless of whatever difficulties and conflicts developed between the Smiths and Plaintiff, there are no factual allegations which show the kind of joint agreement and activity with state actors required to hold a private person liable under § 1983.  Assuming Plaintiff's allegations to be true and taking all inferences in her favor, the Complaint does not make out a claim for relief for any constitutional deprivation inflicted by the Smiths; therefore, the claim is dismissed.  As Plaintiff's cause of action pursuant to § 1983 provides the sole federal claim with respect to the Smiths, dismissal of that claim at this pre-trial juncture warrants dismissal of Plaintiff's remaining state law claims.  See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (2d Cir. 1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); and see, e.g., Iwachiw v. New York State

34

DMV, 299 F. Supp. 2d 117, 124 (E.D.N.Y. 2004).  Accordingly, the Court declines to exercise supplemental jurisdiction over the remainder of claims against the Smiths; they are dismissed.  Further, the Court dismisses the claims against the Smiths with prejudice.  It is apparent that amendment would be futile, as Plaintiff's own allegations reveal that the Smiths are outside the scope of any federal claim in the matters addressed by the this litigation.

**E.  Claims Against Bayview**

Plaintiff asserts various claims against Bayview, including civil rights violations, by broadly posing a number of her claims against all the Defendants.  The factual allegations in the Complaint, as outlined above, are quite minimal and do not bear out the range of claims which are brought.  Indeed, Bayview's role in this matter appears to be entirely limited to issues arising from communications and foreclosure proceedings involving Plaintiff and the Smiths in 2007.  While there may be state law claims arising from those events, they suggest no basis for Plaintiff's sole federal cause of action, a § 1983 conspiracy claim.  As is the case with the Smiths, Plaintiff fails to allege any facts which show the kind of joint agreement and activity with state actors required to hold a private person liable under § 1983.  By Plaintiff's own allegations, Bayview is wholly unconnected to the conspiracy between the Village Defendants and Loremans depicted in the Complaint.  As such, the § 1983 claim is dismissed.  Given that no federal claims remain as against Bayview, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims; accordingly, they are dismissed.  The Court dismisses the claims against Bayview with prejudice, as the allegations against the complaint indicate no possibility of a federal claim related to the present action.  Amendment would be futile, and this litigation must move forward.

**F.  Claims Against Standard Federal Bank**

35

Review of the Complaint reveals that Standard has no relationship to either the other Defendants in this action or to the subject matter of this case.  Standard, by way of being the successor by merger to ABN AMRO Mortgage Group, has held the mortgage on a home belonging to Plaintiff's ex-husband.  As explained above, a long-running dispute has occurred between Plaintiff and ABN AMRO, now Standard, over Plaintiff's rights and obligations and Standard's foreclosure efforts concerning the property.  All of this has no discernible connection to the Front Street property, much less to the allegations of wrongdoing that this action primarily addresses.  Necessarily, then, Plaintiff's § 1983 cause of action  must be dismissed for failing to state a claim, as no factual allegations implicate Standard in a conspiracy to deprive Plaintiff of due process.  Once the § 1983 claim falls out, there is no other basis for federal jurisdiction, aside from passing reference to the Fair Debt Collection Practices Act and Real Estate Settlement Practices Act.  Plaintiff merely mentions the names of these statutes in her Complaint and makes the single, conclusory allegation that Standard acted "in contrast to the Fair Debt Collection Practices Act." Compl. at 40.  Without allegations of what particular conduct violated what particular provision of the Fair Debt Collection Practices Act, Plaintiff's pleading is deficient.  Further, given that a claim under the Act is subject to a statute of limitations of one year, it is unclear whether a viable claim could be brought on the basis of Plaintiff's present factual allegations. (Foreclosure occurred in January 2007; summons as to ABN AMRO was issued August 14, 2007 on the second amended Complaint, which was returned unexecuted on October 25, 2007; summons on the third amended Complaint was issued January 31, 2008 .)  See Dkt. Nos. 13, 24, 62.  In any event, to the extent that Plaintiff seeks to assert claims predicated on the Fair Debt Collection Practices Act and Real Estate Settlement Practices Act, those claims are dismissed.  As with the Smiths and Bayview, only state

claims remain at this pre-trial stage.  The Court, therefore, declines to exercise supplemental jurisdiction over those claims, and they are dismissed.  The Court dismisses the claims against Standard with prejudice, as the allegations against Standard indicate no possibility of a federal claim related to the subject of this action: wrongdoing concerning the Front Street premises.  Standard simply has no place in this action.

Standard brings a Motion seeking an Order of this Court, pursuant to N.Y. CPLR. § 6514, vacating a Notice of Pendency, initially filed February 7, 2008 in the Essex County Clerk's Office, on the disputed home at 20 Thompson Road, Keeseville, New York; a later Notice of Pendency was filed May 8, 2009.  Under New York law, where a plaintiff brings an action affecting title to real property, the plaintiff may file a Notice of Pendency; "the proper forum for affected property owners who seek to cancel or correct a notice of pendency is the court in which the land claim is pending." Cayuga Indian Nation v. Fox, 544 F. Supp. 542, 548 (N.D.N.Y. 1982); N.Y. C.P.L.R. § 6514; see also Fed. R. Civ. P. 64.  The instant Notices of Pendency were filed by Plaintiff pursuant to the this action.  Standard indicates several defects in the validity of the Notices, including that Plaintiff's claim only seeks money damages against Standard, that title and possession of the disputed residence have already been litigated to a final judgment by a state court, and that there is no proof of service of summons as to Standard within 30 days of the filing of the Notices.  See N.Y. CPLR § 6512.  Since the Court has already dismissed all claims against Standard, however, the Court shall vacate the Notices because their underlying action has been dismissed.

## G. Remaining Claims

Following this Memorandum-Decision and Order, the Smiths, Bayview and Standard will have had all claims against them dismissed and will no longer be parties to this action.  The Village

Defendants and the Loremans will continue as parties, each with the following claims remaining against them: a § 1983 claim for deprivation of, and conspiracy to deprive, Plaintiff of due process rights (both procedural and substantive), a claim for breach of an implied covenant of good faith and fair dealing, and a claim for intentional infliction of emotional harm.  All other claims against the Village Defendants and Loremans will have been dismissed with prejudice.  Given that the instant Decision is considering Plaintiff's Third Amended Complaint, the Court finds that Plaintiff has had adequate opportunity to state her claims against the Defendants.  If the defects in her dismissed claims could have been remedied, they should have been by now.  To allow further amendment in order for Plaintiff to make another attempt at stating her dismissed claims would cause a level of delay and prejudice which cannot be allowed at this juncture.  Therefore, dismissal with prejudice is necessary.

### E.  Motion to Supplement

On August 21, 2009, while the Defendants' Motions to dismiss were pending and months after briefing was complete for those Motions, Plaintiff submitted a Motion to supplement her pleadings.  Under Federal Rule of Civil Procedure 15(d), "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d).  Plaintiff's filing does not properly fit within the scope of Rule 15(d), however, as  it consists of a vast narrative in further opposition to Defendants' Motions to dismiss in the form of a combined 126 pages of memorandum, her own "affidavits" and exhibits.  Events prior to Plaintiff's Third Amended Complaint feature prominently in this narrative.  Assorted new allegations are included in these papers, labeled as "new evidence," but they are primarily a discussion about the

new owner of the Front Street property and have no salience for Plaintiff's claims against the Village and Loremans.  Given the nature of Plaintiff's filing, rather than a Motion to supplement, it may be that she seeks to amend her pleading under Rule 15(a)(2), which provides that after a plaintiff has amended its pleading as of right, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

Regardless of whether Plaintiff's Motion is construed as coming under Rule 15(d) or 15(a)(2), it is denied.  "As is the case with an amended pleading, a district court can, in the exercise of its discretion, deny a motion to serve a supplemental pleading when there is undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility." In re Am. Int'l Group, Inc. Sec. Litig., 04-cv-8141, 2008 U.S. Dist. LEXIS 55106 at *9 (S.D.N.Y.  July 18, 2008) (citing Quaratino v. Tiffany & Co., 71 F.3d 58, 66 (2d Cir. 1995). Plaintiff's Motion to supplement or amend will almost certainly cause undue prejudice and delay, and the substance of her filing suffers from futility, as well.  The viable claims raised by Plaintiff concern alleged conduct by the Village Defendants and Loremans that has already transpired.  There is simply no reason for additional allegations with no clear relationship to those claims and that conduct to be allowed in iteration of Plaintiff's Complaint.  The pleading presently before the Court is Plaintiff's Third Amended Complaint, and justice requires that this litigation move forward.

### III.     CONCLUSION

Accordingly, it is hereby:

ORDERED, that Defendant Bayview Loan Servicing, LLC's Motion to dismiss (Dkt. No. 152) is **granted**, consistent with this Decision.  All claims against it are dismissed with prejudice, and Bayview is dismissed as a party; and it is further

ORDERED, that Defendant Standard Federal Bank's Motion to dismiss (Dkt. No. 155) is **granted**, consistent with this Decision.  All claims against it are dismissed with prejudice, and Standard is dismissed as a party; and it is further

ORDERED, that Standard Federal Bank's Motions to vacate Notices of Pendency filed by Plaintiff predicated on this action (Dkt. Nos. 155, 200) are **granted**, consistent with this Decision; and it is further

ORDERED, that Defendants Carolyn and Donald Loreman's Motion to dismiss (Dkt. No. 160) is **granted in part** and **denied in part**, consistent with this Decision; and it is further

ORDERED, that Defendants Kathryn Wilson and Kenneth L. Smith's Motion to Dismiss (Dkt. No. 162) is **granted**, consistent with this Decision.  All claims against them are dismissed with prejudice, and the Smiths are dismissed as parties; and it is further

ORDERED, that Defendants The Village of Keeseville, Mark J. Whitney, William Seaver, and William O'Conner's Motions to dismiss (Dkt. Nos 165, 166) are **granted in part** and **denied in part**, consistent with this Decision; and it is further

ORDERED, that Plaintiff Karen Marie Adams' Motion to supplement (Dkt. No. 199) is **denied**; and it is further

ORDERED, that the Clerk serve a copy of this Decision and Order on all parties.

**IT IS SO ORDERED**.

Dated:   September 01, 2010
          Albany, New York

Lawrence E. Kahn
U.S. District Judge

41